# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D2023-2252

_____

SECRETARY OF STATE BYRD, the
FLORIDA HOUSE OF
REPRESENTATIVES, and the
FLORIDA SENATE,

    Appellants,

    v.

BLACK VOTERS MATTER
CAPACITY BUILDING INSTITUTE,
INC., EQUAL GROUND
EDUCATION FUND, INC., LEAGUE
OF WOMEN VOTERS OF FLORIDA
EDUCATION FUND, INC., FLORIDA
RISING TOGETHER, PASTOR
REGINALD GUNDY, SYLVIA
YOUNG, PHYLLIS WILEY, ANDREA
HERSHORIN, ANAYDIA
CONNOLLY, LEELA FUENTES,
BRANDON P. NELSON, KAITLYN
YARROWS, CYNTHIA LIPPERT,
KISHA LINEBAUGH, NINA
WOLFSON, BEATRIZ ALONZO,
GONZALO ALFREDO PEDROSO,
and MARVIN HUDSON,

    Appellees.

_____

On appeal from the Circuit Court for Leon County.
James Lee Marsh, Judge.

December 1, 2023

EN BANC

B.L. THOMAS and TANENBAUM, JJ.

On review is a declaratory judgment. In it, the trial court determined that Chapter 2022-265, Laws of Florida[1]—setting out the legal boundaries of the State's congressional districts based on the post-2020 census federal reapportionment—conflicts with Florida's congressional Fair Districts Amendment ("FDA")—article III, section 20, of the Florida Constitution.[2] The enactment, according to the trial court, "dismantl[ed] a congressional district that enabled Black voters to elect their candidates of choice under the previous plan"—a court-ordered configuration of districts to remedy what had been determined to be an unconstitutional *partisan* gerrymander under the same FDA.

The trial court rendered its judgment as a legal matter. There was no trial, and the court appears to have relied entirely on the parties' stipulations. We can resolve this appeal by answering a simple legal question: In order to demonstrate a legally cognizable claim that an "apportionment plan or individual district . . . diminish[es] [a member of a racial minority's] ability to elect representatives of [his or her] choice," does a plaintiff first have to establish that he or she is part of a geographically discrete and compact minority community of historically natural existence? Art. III, § 20(a), Fla. Const. The trial court found it unnecessary to answer the question, and the plaintiffs failed to submit any evidence to this effect.

We, however, say yes. *Cf.* Voting Rights Act of 1965, §§ 2(b), 5(b) (as amended), *codified at* 52 U.S.C. §§ 10301(b), 10304(b)

---

[1] The law is now codified as chapter eight of the Florida Statutes (2022).

[2] Voters approved two "Fair Districts" Amendments in 2010. Article III, section 21 of the Florida Constitution sets forth similar standards for establishing state legislative districts.

(hereinafter, "VRA"); *Thornburg v. Gingles,* 478 U.S. 30, 49–51, n.15–17 (1986) (highlighting need for "a politically cohesive, geographically insular minority group" to support claim about "ability of minority voters to elect representatives of their choice"); *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 286 n.11 (Fla. 2015) ("*Apportionment VIII*") (noting that *Gingles* is relevant to analysis under both section two and section five of the VRA and that "when we interpret our state provision prohibiting the diminishment of racial or language minorities' ability to elect representatives of choice, we are guided by any jurisprudence interpreting Section 5" (quoting *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 619 (Fla. 2012) ("*Apportionment I*"))). We address these citations in the discussion that follows.[3] In the end, we must reverse.

## I

### A

Tallahassee and Jacksonville are separated by about 160 miles of interstate highway (and two Busy Bee fuel-and-convenience destination stops[4]), plus ample byways, farmland, and small communities. The two cities also are separated by drastically different origins and histories—one as a compromise capital location midway between Pensacola and St. Augustine, and the other as a port city and winter vacation destination.[5] In

---

[3] Based on this court's interpretation of the FDA, we do not address the appellants' argument regarding the equal-protection guarantee of the Fourteenth Amendment to the U.S. Constitution.

[4] https://shopthebusybee.com/

[5] The supreme court recently recognized the distance and difference between the two cities was significant enough to justify realigning the appellate districts and separating Jacksonville from the district that includes Tallahassee. *See In re Redefinition of App. Dists. & Certification of Need for Additional App. Judges*, 345 So. 3d 703, 704 (Fla. 2021); District Court of Appeal Workload and Jurisdiction Assessment Committee Final Report and Recommendations, available at

2017, though, the two cities found themselves lumped together into a single congressional district—Congressional District Five ("CD-5")—as part of a court-ordered remedy for a legislative violation of another part of the FDA: the proscription against defining a congressional district "with the intent to favor or disfavor a political party or an incumbent." Art. III, § 20(a), Fla. Const.; *see League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 370–72 (Fla. 2015) ("*Apportionment VII*") (affirming trial court's determination "that the Legislature's 2012 congressional redistricting plan was drawn in violation of the [FDA's] prohibition on partisan intent" but directing the trial court to "require the Legislature to redraw, on an expedited basis, Congressional Districts 5, 13, 14, 21, 22, 25, 26, 27, and all other districts affected by the redrawing, pursuant to the guidelines set forth in this opinion").

Before 2010, CD-5 had a north-south orientation, meandering from Jacksonville to Orlando, and it consistently elected a Black member of Congress. Following the 2010 census, the Legislature redefined CD-5 to increase the Black voting age population ("BVAP") in the district to over fifty percent—a so-called majority-minority district. *See Apportionment VII*, 172 So. 3d at 386. The trial court found, after a trial on a challenge to the 2010 redistricting plan alleging that the district was drawn with improper partisan intent, that there had been no showing of legal necessity to create such a district, and the court concluded that CD-5 (along with CD-10), in part, had been "drawn" to benefit the Republican Party. *Id.* The trial court ordered the Legislature to provide a new delineation of CD-5, CD-10, and "any other districts affected thereby." *Id.* It rejected challenges to several other districts. *Id.* The Legislature enacted a new plan that made "modest changes to" CD-5 and CD-10, and the trial court approved the new plan. *Id.*

On appeal from the trial court's order, the supreme court concluded that the trial court's remedy did not give sufficient effect to the higher court's determination that "the redistricting

---

https://www.flcourts.org/content/download/218249/file/dca_workload.pdf.

4

process and resulting map were 'taint[ed]' by unconstitutional intent to favor the Republican Party and incumbents." *Id.* at 416. The supreme court noted that the "finding of unconstitutional intent . . . mandated a more meaningful remedy commensurate with the constitutional violations [the trial court] found." *Id.* Along those lines, the court took umbrage with the trial court's rejection of the challengers' proposed east-west configuration of CD-5 and its approval of a slightly modified CD-5 that still ran north-south. *See id.* at 402–03. The court in particular took issue with the trial court's failure to elaborate on the "non-partisan policy reasons" that it had found existed for the Legislature's preference for a north-south configuration, especially given the challengers' contention that "the North-South configuration of this district [was] a linchpin to the Legislature's efforts *to draw a map that favors the Republican Party.*" *Id.* at 402 (emphasis supplied).

The supreme court rejected the Legislature's explanation for the north-south orientation, noting that the "configuration was entitled to no deference in light of the trial court's finding of unconstitutional intent . . . to benefit the Republican Party." *Id.* at 403. It also noted that the configuration "had the effect of benefitting the long-time incumbent of the district, Congresswoman Corrine Brown," a Black woman. The court explained further, as follows:

> Retaining the same basic shape [of CD-5], while merely tweaking a few aspects of the district, does not erase its history or undo the improper intent that the trial court found. The trial court's decision to defer to the Legislature's configuration is contrary to the proper standard that should have applied—shifting the burden to the Legislature to justify its enacted configuration— particularly where the trial court itself continued to acknowledge that the district is "not a model of compactness."

*Id.* at 403.

There was much discussion by the court about BVAP numbers and voting performance (basically, cold voter data and statistics), but there was no detail provided about the existence of

5

Black communities within either orientation (*i.e.*, nothing about the composition of naturally occurring communities in a geographically discrete region, and nothing about any shared history or shared experiences of the Black voters). This latter discussion does not appear to have ever come up. The court instead concluded this way based on the numbers: "Because the trial court erred in deferring to the Legislature's enacted North–South configuration, and because the Legislature cannot justify this configuration, District 5 must be redrawn in an East–West orientation." *Id.* at 406.

When the case returned to the trial court for consideration of the more robust remedy that the supreme court directed, the Legislature failed to enact a new remedial plan. *See Apportionment VIII,* 179 So. 3d at 261. The parties instead proposed remedial plans to be adopted by court order; and while they disagreed over some of the congressional districts, the parties agreed to, among others, a "redrawn" CD-5 that ran east-west. *Id.* at 262. The trial court recommended a congressional redistricting plan that included the new CD-5, and the supreme court approved it for use "in the 2016 Florida congressional elections and in Florida congressional elections thereafter *until the next decennial redistricting.*" *Id.* at 263 (emphasis supplied). Based on the supreme court's approval and instruction, the trial court rendered a final judgment incorporating the court-drawn plan as a remedy to be in effect until it expired with the enactment of a new congressional districting law in 2022. *Id.*

Florida's congressional elections in 2016, 2018, and 2020, then, were conducted in districts that had not been enacted into law. The CD-5 that the court ordered to be operative for those elections (and then expire) "appeared" (in purple) as follows on the adopted redistricting map:

6



B

The congressional reapportionment that occurred as a product of the 2020 census gave Florida one additional seat, increasing the State's complement of apportioned U.S. House members to 28.[6] The Legislature enacted a redistricting plan that

---

[6] Congressional "reapportionment" occurs at the federal level. Congress sets, by law, the number of members of the House of Representatives. *See* Pub. L. 62-5, 37 Stat. 13 (Aug. 8, 1911) ("Apportionment Act of 1911"); Pub. L. 71-13, § 22, 46 Stat. 21 (June 18, 1929) ("Reapportionment and Census Act of 1929"). The President of the United States reapportions members among the fifty states based on the most recent decennial census. *See* 2 U.S.C. § 2a(a) (directing the President to transmit to Congress a statement of the population of each state determined under the decennial census, along with "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member"); *see also* 2 U.S.C. § 2a(b) (entitling each state to "the number of Representatives shown in the statement [from the President]" and requiring the clerk of the House of Representatives "to send to the executive of each State a certificate of the number of Representatives to which such State is entitled under this section"). Federal law requires that each state in turn "establish[] *by law* a number of districts equal to the number of Representatives to which such State is so entitled, and

7

the Governor signed into law. *See* Ch. 2022-265, Laws of Fla., *codified at* Ch. 8, Fla. Stat. (2022). With that enactment, the remedial order requiring the east-west CD-5 expired.

The new chapter eight delineates Florida's apportioned twenty-eight congressional districts by "employ[ing] areas included within official county, tract, block groups, and block boundary descriptions used by the [U.S. Census] in compiling the" 2020 census numbers for the State. § 8.0001(1), Fla. Stat. (2022).[7] Official electronic maps provide to the public visual representations of these legally defined boundaries. *See* § 8.051, Fla. Stat. (2022); *see also* § 8.0001(2)(e), Fla. Stat. (2022) (defining "geographical information systems [GIS] map"). But elections occur in Florida precinct by precinct, each county is responsible for delineating its precincts. *See* §§ 98.0981(3); 101.045; 101.5604; 101.5606; 101.5610; 101.5614; 101.657(1)(a), (4)(c); 101.69; 101.71; 102.012; 102.071; Fla. Stat.; *cf.* §§ 1S-2.015, 1S-2.032, Fla. Admin. Code. The delineations in chapter eight, in turn, govern in which congressional district contest each precinct will participate. *See* § 101.001(1), (3), (4), Fla. Stat.[8] The resultant map of the North Florida congressional districts addressed in this appeal is as follows:

---

Representatives shall be elected only from districts so established." 2 U.S.C. § 2c (emphasis supplied).

[7] A "tract" is a "relatively permanent statistical subdivision of a county." § 8.0001(2)(f), Fla. Stat. (2022). A "block" is "the smallest geographic unit for which population was tabulated in the 2020 decennial census," and it is "nested within tracts and within block groups." § 8.0001(2)(a), Fla. Stat. (2022).

[8] The "blocks" are the component geographic parts that make up each congressional district. *See* § 8.0001(2)(b), Fla. Stat. (2022) (defining a "block equivalency file" as "a list of all blocks within the state and the congressional district number designated for each block"); *cf.* § 8.051, Fla. Stat. (2022).



Florida
Congressional Districts
P000C0109
* * * * *
by J. Alex Kelly
* * * * *

The plaintiffs sued to challenge that new chapter eight. They eventually narrowed their challenge to one theory: that the newly enacted chapter eight diminishes the ability of Black voters in the former CD-5 to elect the congressperson of their choice. Their theory has as its premise that Black voters in North Florida have the right to "elect the candidate of their choice" because they had been "drawn" into former CD-5. From that premise, they conclude that there is diminishment based almost entirely on what they characterize as the "obliterat[ion]" of CD-5 under the new chapter eight. Even though the first two named plaintiffs—Black Voters Matter and Equal Ground Education Fund—describe themselves in terms of the "historic" or "underserved" Black "communities" they serve, their complaint nowhere purports to describe or otherwise identify any naturally occurring community whose members have been harmed. Instead, the complaint assumes—without addressing any elements of cohesion or unifying characteristics (besides statistical voting performance)—that the Black voters pulled into CD-5 constitute a single operative community by operation of law.

There was no trial on the plaintiffs' claim. The parties stipulated to several purported facts regarding voters in former CD-5—essentially, just cold statistical information about Black voters generally. This is all the trial court knew about the Black voters in the former CD-5 (and all we can know): According to the stipulation, former CD-5 had a BVAP of 46.2 percent, and 46.1 percent of former CD-5's registered voters were Black. In 2016, 2018, and 2020, approximately 89 percent of Black voters in former CD-5 voted for Democratic candidates in the general

9

elections. There were other purported facts that the parties did not dispute regarding the "performance" of former CD-5 for Black and non-Black voters.

The parties stipulated to a similar type of cold statistical data regarding the newly enacted chapter eight: 45.2 percent of the population that was contained in the former CD-5 is in the new CD-4, with the remainder split across new CD-2, CD-3, and CD-5; the BVAP in new CD-2, CD-3, CD-4, and CD-5 are 23.1 percent, 15.9 percent, 31.7 percent, and 12.8 percent, respectively; and more than 75 percent of Black voters in these four new districts voted for the Democratic candidate in 2022.

Similar to the dearth of information about Black voters in *Apportionment VII* and *Apportionment VIII*—and commensurate with the allegations that we noted were missing from the complaint in this case—the plaintiffs did not submit any evidence regarding the existence of naturally occurring (rather than court-manufactured) Black communities within the former CD-5. Nothing in the record describes who the Black voters are as members of a meaningful community—nothing about a shared history or shared socio-economic experience among the Black voters in Tallahassee, Jacksonville, and other areas throughout the expanse of former CD-5. No evidence in the record establishes any relationship at all between any of the otherwise seemingly disparate communities. What we are left with is a stipulation that Black voters were grouped together to reach a preferred or acceptable BVAP number within an east-west congressional district, and that "Black voters had the ability to elect the candidate of their choice in" former CD-5. According to the parties, not one of new CD-2, CD-3, CD-4, or CD-5 is a district "in which Black voters have the ability to elect their preferred candidates." The trial court accepted all these stipulated facts as its findings—including the last one regarding the ability or inability to elect a candidate of choice. Without making any determination about the existence or nature of any naturally occurring Black community in either the former CD-5 or the new

10

CD-2, CD-3, CD-4, or CD-5.[9] It concluded that the new chapter eight violated the FDA by "dismantling" former CD-5.

The problem we have is this: Whether Black voters could "elect the candidate of their choice" in former CD-5–or in the new CD-2, CD-3, CD-4, or CD-5–is ultimately a legal question. It is not a question that the parties can answer by stipulation. To answer the question, we must determine what it means for a delineated congressional district to have the result of "diminish[ing]" the ability of a racial minority "to elect representatives of their choice." That is what we set out to do now.

II

This is a direct appeal of a trial court's final, declaratory judgment determining that chapter eight of the Florida Statutes (2022) violates the FDA. The constitution calls upon us to determine whether the trial court erred in its legal determination that the law's boundaries for the congressional districts in North Florida "diminish [the] ability [of a racial minority] to elect representatives of their choice," in conflict with the FDA's proscription against doing so. Art. III, § 1(a), Fla. Const. After all, as a matter of textual interpretation, a trial court may not *refuse* to enforce a duly enacted legislative statement of public policy unless the statement conflicts with a superior law—typically a constitution. *Cf. Marbury v. Madison*, 5 U.S. 137, 177–78 (1803) ("If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."); *Chapman v. Reddick*, 25 So. 673, 677 (Fla. 1899) ("Our state constitution is a limitation upon power, and, unless legislation duly passed be clearly contrary to some

_____

[9] The trial court rejected any argument that there must be evidence of an insular and geographically compact community of Black voters in a diminishment claim like the plaintiffs assert here. It opted to look only at whether "there is no Black-performing district where there previously was." As we explain, this core decision was based on an erroneous interpretation of the FDA.

11

express or implied prohibition contained therein, the courts have no authority to pronounce it invalid.").

A conflict, though, must exist before the superior law will prevail over the inferior law. To determine whether there is such a conflict, we must assess the meaning of the relevant FDA text and then decide how it operates vis-à-vis chapter eight. *Cf. Marbury*, 5 U.S. at 177 ("It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each."). Based on our interpretation of the FDA, we find that the plaintiffs failed to meet their burden to demonstrate a conflict between the two laws.

A

The two laws that purportedly conflict—according to the plaintiffs and the final judgment on review—are the congressional districting plan set out in chapter eight, on the one hand; and the latter part of subdivision (a) of the FDA— specifically dealing with diminishment of racial minorities' "ability to elect representatives of their choice"—on the other. We described chapter eight earlier, so we turn to the applicable constitutional provision.

Proposed by initiative petition filed in 2007, *see* Art. XI, § 3, Fla. Const., and approved by Florida voters in 2010, the FDAs prohibit the Legislature from defining congressional and legislative district boundaries, respectively,

> with the intent or result of *denying or abridging the equal opportunity* of racial or language minorities to *participate in the political process* or to *diminish their ability to elect representatives of their choice.*

Art. III, §§ 20(a), 21(a), Fla. Const. (emphasis supplied). There obviously could be no readily apparent facial conflict between this provision and the delineation found in chapter eight (given the technical nature of the statutory provisions therein, described above). Instead, a claim that a districting statute conflicts with

12

the FDA requires evidentiary proof that the challenged statute is a product of a prohibited intent, or in operation produces a prohibited result. As we noted above, the legal question we must answer is what type of proof is required to establish this violation and sustain such an as-applied constitutional challenge. The answer is in the meaning behind the highlighted text.

We are mindful that we are construing a provision of the Florida Constitution here. As the supreme court observed nearly a century ago,

> [g]eneral principles governing the construction of statutes are applicable to the construction of Constitutions with some modifications. . . . Technical rules of construction [] are not to be applied so as to defeat the principles of government or the object of its establishment. The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and the people who adopted it. The object sought to be accomplished, therefore, must be kept constantly in view.

*City of Jacksonville v. Cont'l Can Co.*, 151 So. 488, 489 (Fla. 1933). Our aim is "to give effect to the purpose indicated by a fair interpretation of the language, the natural signification of the words used in the order, and grammatical arrangement in which they have been placed." *Id.* "If the words thus regarded convey a definite meaning and involve no absurdity or contradiction between the parts of the same instrument, no construction is allowable." *Id.* At the same time, "[t]he rules used in construing statutes are in general applicable in construing the provisions of a Constitution." *State ex rel. McKay v. Keller*, 191 So. 542, 545 (Fla. 1939); *see also Coastal Fla. Police Benevolent Ass'n v. Williams,* 838 So. 2d 543, 548 (Fla. 2003) (same).

Getting back to the highlighted phrases, we note that each finds a nearly identical companion text in the VRA, which we will describe in turn. First enacted in 1965, the VRA primarily prohibited any state from using any "voting qualification or prerequisite" or any "standard, practice, or procedure . . . to *deny or abridge* the right of any citizen of the United States to vote on account of race or color." Pub. Law 89-110, § 2 (Aug. 6, 1965)

(emphasis supplied). It also subjected certain states and subdivisions to a pre-clearance process by which any voting law that differs from that "in force or effect on November 1, 1964" would be reviewed by the District of Columbia federal trial court to determine whether the change had the purpose or effect "of *denying or abridging* the right to vote on account of race or color." *Id.* § 5 (emphasis supplied). According to the U.S. Supreme Court, the VRA

> was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century. The Act creates stringent new remedies for voting discrimination where it persists on a pervasive scale, and in addition the statute strengthens existing remedies for pockets of voting discrimination elsewhere in the country.

*South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).

Congress amended section two of the VRA in 1982 to add the following *definition* of a violation of section two (essentially, the denial or abridgment of the right to vote based on race or color):

> A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have *less opportunity than other members of the electorate to participate in the political process* and *to elect representatives of their choice.*

Pub. Law 97-205, § 3 (June 29, 1982) (emphasis supplied). Then, just a year before the filing of the FDA initiative petition to amend the Florida Constitution, Congress amended section five of the VRA to define "denies or abridges" in similar language (with slight variations), as follows:

> Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting

14

that has the purpose of or will have the effect of *diminishing the ability* of any citizens of the United States on account of race or color . . . *to elect their preferred candidates of choice* denies or abridges the right to vote within the meaning of subsection (a) of this section . . . .

Pub. Law 109-246, § 5 (July 27, 2006) ("Criteria for Declaratory Judgment"), *codified at* 52 U.S.C. § 10204(b) (emphasis supplied).

At this point, we will address the Florida Supreme Court's treatment in *Apportionment I* of article III, section 21(a) (which addresses state legislative apportionment) in a *facial* assessment of a districting plan as part of its function under article III, section 16. We will then turn to how the U.S. Supreme Court has interpreted the nearly identical text found in sections two and five of the VRA.

B

1

State legislative apportionment—the determination of state senatorial and representative districts—is a unique process under the Florida Constitution. *See* Art. III, § 16, Fla. Const. The apportionment required of the Legislature occurs by joint resolution and has the force of law. *See id.* §16(a). It is the only legislative enactment that becomes law without presentment to the Governor for approval. *Cf.* Art. III, § 8, Fla. Const. The presentment requirement for all other enactments makes the Governor an adjunct of the legislative process—a check within the context of the Legislature's exercise of the plenary authority vested in it by article III. Within the legislative process for the purpose of state legislative apportionment, however, the constitution instead designates the Supreme Court of Florida as the check on the Legislature. *See* Art. III, § 16(c), Fla. Const.[10]

---

[10] The process set out article III, section 16, applies only to state legislative "apportionment"—so called because the Legislature, when it delineates the districts by joint resolution, effectively determines both the number of senators and

15

In that capacity, under section 16, the supreme court exercises *original* jurisdiction to issue "a declaratory judgment determining the validity of the apportionment" upon petition by the attorney general. *Id.*[11] To be clear, in this context, *there is no lower court judgment under review*, so the court's declaratory judgment under article III, section 16, cannot be the exercise of *appellate* jurisdiction. *Cf. Marbury*, 5 U.S. at 175–76 ("It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. . . . [T]o issue such a writ to an officer for the delivery of a paper, is in effect the same as to sustain an original action for that paper, and therefore seems not to belong to appellate, but to original jurisdiction."); *The Alicia*, 74 U.S. 571, 573 (1868) ("An appellate jurisdiction necessarily implies some judicial determination, some judgment, decree, or order of an inferior tribunal, from which an appeal has been taken."); *Webster v. Cooper*, 51 U.S. 54, 55 (1850) (explaining that "an appellate court [revises] the decisions of inferior tribunals"); *Ex parte Crane*, 30 U.S. 190, 193 (1831) (distinguishing between a writ to an executive officer, which would "be the exercise of

---

representatives and how they are to be allocated geographically throughout the State. The process does not apply to congressional districts. As described above, the President reapportions the statutorily set 435 *congressional* seats based on the latest census numbers and congressionally set formula, which then entitles each state to the number of congressional seats the President reports. The Legislature, in turn, *redistricts* by enactment—under the typical process set out in article III, sections six through eight—based on the number of members apportioned to the State under the federally prescribed process. The law delineating these congressional districts is *not* subject to the supreme court's "plenary authority" like the apportionment joint resolution is. *See Apportionment I*, 83 So. 3d at 600.

[11] Section sixteen also gives the supreme court the authority to order apportionment on its own under two different scenarios where the Legislature fails to act. *See* Art. III, § 16(b), (f), Fla. Const.

original jurisdiction," and one "to an inferior court of the United States," which would be the exercise of "appellate jurisdiction"); *Ex parte Bollman*, 8 U.S. 75, 100–01 (1807) (distinguishing appellate jurisdiction as "the revision of a decision of an inferior court"); *Ortiz v. United States*, 138 S. Ct. 2165, 2191 (2018) (Alito, J., dissenting) ("And as Blackstone suggested, what 'creates' a 'case' in the relevant sense—that is, what transforms a dispute into a 'case' that an appellate court has jurisdiction to resolve—is the prior submission of the dispute to a tribunal that is lawfully vested with *judicial* power." (emphasis supplied)); *Ortiz v. United States*, 138 S. Ct. 2165, 2184–85 (2018) (Thomas, J., concurring) ("Thus, this Court cannot exercise appellate jurisdiction unless it is reviewing an already completed exercise of 'judicial power.'" (citing *In re Sanborn,* 148 U.S. 222, 224 (1893))).

Because the supreme court does not act as an appellate court in a review under article III, section 16, it also does not function *judicially* in a supervisory capacity as head of the branch. *Cf. Cohens v. Virginia*, 19 U.S. 264, 396 (1821) ("A supervising Court, whose peculiar province it is to correct the errors of an inferior Court, has no power to correct a judgment given without jurisdiction, because, in the same case, that supervising Court has original jurisdiction."); *Ansin v. Thurston*, 101 So. 2d 808, 810 (Fla. 1958) ("The new article embodies throughout its terms the idea of a Supreme Court which functions as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice, with review by the district courts in most instances being final and absolute."); *Jenkins v. State*, 385 So. 2d 1356, 1357–58 (Fla. 1980) (same); *The Fla. Star v. B.J.F.*, 530 So. 2d 286, 288–89 (Fla. 1988) (noting that the court "has subject-matter jurisdiction to hear any petition arising from an *opinion* that establishes a point of law" (emphasis supplied)).

The court in its decision in *Apportionment I* (and in its follow-up decision in what has become known as *Apportionment*

*II*[12]) did not review a lower court's interpretation or application of the law. The court's analysis in those two decisions was akin to what a trial court does when it seeks to apply the law to a certain set of facts. The court's pronouncements in that capacity, then, should not operate as holdings of a superior appellate court. For this reason, we do not view the broad pronouncements—applied with varying degrees of clarity to the specific facts of the original proceeding—as binding in this direct appeal. *Cf. Parsons v. Fed. Realty Corp.*, 143 So. 912, 920 (Fla. 1931) ("A ruling in a case fully considered and decided by an *appellate court* is not dictum merely because it was not necessary, on account of one conclusion reached upon one question, to consider another question the decision of which would have controlled the judgment." (emphasis supplied)); *Myers v. Atl. Coast Line R.R. Co.*, 112 So. 2d 263, 266 n.4 (Fla. 1959) ("The general rule is that when an *appellate court* passes upon a question and remands the case for further proceedings, the questions there settled become the 'law of the case' upon subsequent appeal, provided the same facts and issues which were determined in the previous appeal are involved in the second appeal." (emphasis supplied)); *Pardo v. State*, 596 So. 2d 665, 666–67 (Fla. 1992) (explaining how, "in the absence of interdistrict conflict, district court decisions bind all Florida trial courts" and describing "the proper hierarchy of decisional holdings" as between district courts and the supreme court, and trial courts and the district courts).

Still, the pronouncements are from our supreme court, so we cannot dismiss them out of hand. We have taken the textual analyses into account here. Even if the pronouncements *could* be considered "holdings," however, their applicability cannot get us very far here because the procedural *posture* of both *Apportionment I* and *Apportionment II* (*viz.*: original jurisdiction, limited facial review of a legislative enactment) differs markedly from the posture of this direct appeal (*viz.*: appellate review of trial court judgment on as-applied challenge to legislative enactment).

---

[12] *In re Senate Joint Resol. of Legis. Apportionment 2-B*, 89 So. 3d 872 (Fla. 2012).

The supreme court itself later made this distinction: "[T]he declaratory judgment rendered by this Court pursuant to article III, section 16, is binding as to the facial validity of the apportionment plan, *but not to subsequent fact-based challenges.*" *Fla. House of Representatives v. League of Women Voters of Fla.*, 118 So. 3d 198, 209 (Fla. 2013) ("*Apportionment III*") (emphasis supplied); *see also id.* ("[P]ursuant to article III, section 16, this Court is charged with the responsibility to render a declaratory judgment as to the facial validity of a plan in order to provide certainty as to its facial validity prior to the upcoming election."); *id.* at 210 (noting that a declaratory judgment rendered under article III, section 16 is "a determination of only the facial validity of the [redistricting] plan" and "did not preclude subsequent, fact-based challenges" to the same plan); *cf. In re Apportionment Senate Joint Resol. No. 1305, 1972 Regular Session*, 263 So. 2d 797, 808 (Fla. 1972) ("In other words, the apportionment plan as framed may be constitutional on its face, but upon its application in a particular case the joint resolution may violate organic law. This is in accord with our holdings that a statute may be valid as applied to one state of facts, though invalid as applied to another state of facts.").

The supreme court in essence viewed *Apportionment I* and *Apportionment II* as decisions of limited application, with no real purchase in a direct appeal from a trial court judgment on an *as-applied* FDA challenge to *congressional* districts. *See Apportionment VII*, 172 So. 3d at 369–70 (characterizing the "appeal" before it as one where the trial court was presented "with a first-of-its-kind challenge under the [FDA]," "involving legal issues of first impression"); *Apportionment VIII,* 179 So. 3d at 262 ("[W]e are acutely aware that this case represents the first time that congressional districts have been challenged under the Fair Districts Amendment. As we have stated before, the trial court had scant precedent to guide it; neither [sic] did the Legislature nor the Challengers." (internal quotation and citation omitted)). Even in *Apportionment I*, the supreme court hinted at the limited nature of what it was doing, viewing its "legislative apportionment jurisprudence" as unique, separate and apart from ordinary jurisprudence involving constitutional challenges to statutes. *Cf. Apportionment I*, 83 So. 3d at 606–07 & n.5 (distinguishing between the unique standard of review in

"legislative apportionment jurisprudence" under article III, section 16, and "[c]hallenges to the constitutionality of ordinary legislative acts passed by the Legislature, [which] must be brought in a trial court and then reviewed by a district court of appeal").

We will view the decisions the same way, and take the pronouncements about the meaning and application of the FDA as guidance, to the extent the general principles stated therein reasonably comport with the text and make sense in application to the circumstances of this case. At all events, as was the case in *Apportionment III*, *Apportionment VII*, and *Apportionment VIII*, this appeal involves a first-of-its-kind, as-applied FDA challenge to a congressional redistricting law. In those former cases, the challenge was based on allegations of partisan intent. The challenge here is based on the effect the new districting enactment has—as a factual matter—on the voting power of the Black population in North Florida. None of those former cases, then, provide holdings that control here.

Moreover, because the supreme court in *Apportionment I* and *Apportionment II* was exercising special original jurisdiction given to it under the apportionment process set out in article III—and in an expedited and limited fashion at that—it is difficult to distinguish an appellate holding on a principle of law from a determination of fact as an adjunct to the article-III process. *See Apportionment III*, 118 So. 3d at 207 (explaining that the court's decisions in *Apportionment I* and *Apportionment II* "were based solely on objective evidence and undisputed facts in the limited record before" it); *id.* at 212 ("Although the Legislature contends that our review pursuant to article III, section 16, in effect, involved fact-finding, we repeatedly emphasized that our determinations in 2012 were based on the limited record before the Court and were constrained by the equally limited nature of the review this Court was able to conduct in the thirty-day facial proceeding mandated by article III, section 16."). Before we move on, we look at what the supreme court in fact said about the provisions of the FDA we deal with here.

20

The plaintiffs zero in on a gloss the supreme court purportedly gave to the diminishment text of the FDA when it noted, "the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts *where doing so* would actually diminish a minority group's ability to elect its preferred candidates." *Id.* (emphasis supplied). The plaintiffs, quite frankly, read too much into this statement. As the highlighted text presages, the statement as a whole adds very little beyond what we already have discussed. The statement basically begs the question, because it merely assumes what has yet to be defined: the "benchmark" from which to measure diminishment, which requires us to explicate what it means for a racial minority group to have the ability "to elect the representative of [its] choice."

And the supreme court did not spend much time in *Apportionment I* on this question. It seemingly assumed, without analysis, that the benchmark in this respect is *any* Black performing district, without regard to whether the district "performs" merely because it has been manufactured that way (by defining the district with an eye toward lumping in Black voters based solely on how they vote compared to how non-Black voters do so). We assume the supreme court was looking to the U.S. Department of Justice's administration of the section-five preclearance regime through guidelines and regulations that define "benchmark" in terms of the "last legally enforceable plan." *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7470 (Feb. 9, 2011). *Cf. Riley v. Kennedy*, 553 U.S. 406, 412 (2008); *Beer v. U. S.*, 425 U.S. 130, 141 (1976).

This simply makes no sense in the FDA context. As the *Riley* Court described that regime, its design presumes prior discrimination in voting practices, thereby "putting the burden on covered jurisdictions to demonstrate that future changes would not be discriminatory." *Riley*, 553 U.S. at 413; *see also id.* ("§ 5 served to shift the advantage of time and inertia from the perpetrators of the evil to its victims." (internal quotation and citation omitted)). From there, the *Riley* court "defined the

baseline as the most recent practice that *was both precleared* and 'in force or effect.'" *Id.* at 421 (emphasis supplied). That whole regime *does not exist* (and could not exist) under the FDA. The FDA clearly does not bring in the entirety of section five of the VRA, so there is no textual basis for using this approach (designed with preclearance in mind) to defining a benchmark in application of the diminishment provision in the FDA. To the extent that the supreme court purported to state otherwise in *Apportionment I*—and require that the benchmark for measuring diminishment is *any* Black performing district previously in place—either that treatment of the FDA text was unnecessary for the task at hand for the court in *Apportionment I*, or it was limited to the unique nature of the facial review the supreme court was conducting.

We are left still having to address the meaning of a minority group's "ability to elect representatives of their choice" in this case of first impression, where an as-applied diminishment challenge has been lodged against a congressional redistricting enactment. That comes next.

## III

The FDA speaks to the effect a redistricting enactment has on a racial minority's "ability to elect representatives of their choice." We know what this term cannot mean. No individual minority (or majority) voter has a right to have his or her candidate win. Otherwise, every such voter who voted for the losing candidate would have a claim under the VRA and FDA. *Cf. Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971) (noting that the "typical American legislative elections are district-oriented, head-on races between candidates of two or more parties," such that "[a]s our system has it, one candidate wins, the others lose," and "[a]rguably the losing candidates' supporters are without representation since the men they voted for have been defeated," yet it is not a "denial of equal protection to deny legislative seats to losing candidates").

This concept of a minority group having an opportunity "to elect representatives of their choice"—as a component of protecting an individual's right to vote against abridgment

because of race—did not appear in the VRA until 1982. As we noted above, it was supplied to section two to further define what denial or abridgment of that right could be. The U.S. Supreme Court interpreted this newly amended section two shortly thereafter. It is there we can turn to help answer the question of what the term means as it appears in the FDA. *See Gingles*, 478 U.S. at 30.[13]

Even though *Gingles* ultimately set out to define the contours of a section-two claim under the VRA, the Court began

---

[13] Prior to the 1982 amendment to the VRA, the U.S. Supreme Court had held in *Mobile v. Bolden*, 446 U.S. 55, 61–74 (1980), that section two was merely a restatement of the protections afforded in the Fifteenth Amendment to the U.S. Constitution, and therefore, a plaintiff had to prove that the challenged voting standard was enacted or maintained, at least in part, by a discriminatory purpose. In 1982, section two of the VRA was amended to focus on the function of the challenged voting standard, as shown by the totality of the circumstances, rather than whether there was discriminatory intent.

The U.S. Senate Committee on the Judiciary issued a report accompanying the 1982 amendment, suggesting factors for courts to use in determining whether operation of a challenged voting standard resulted in a violation of section two. These included history of voting-related discrimination; extent of racially polarized voting; extent of use in the voting subdivision of practices that tend to enhance the opportunity for discrimination against the minority group; exclusion of members of the minority group from the candidate selection process; extent to which the minority group bears effects of discrimination in education, employment, and health that may affect their ability to participate in the political process; use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. S. Rep. No. 97–417, 97th Cong. 2nd Sess. 28 (1982), U.S. Code Cong. & Admin. News 1982, pp. 206–207. The U.S. Supreme Court considered this report in establishing the *Gingles* preconditions. *Gingles*, 478 U.S. at 36–38, 43–46.

with threshold conditions that must be met before there could be said to be an impediment to "the ability of minority voters to elect representatives of their choice." *Id.* at 48 (setting out the so-called *Gingles* preconditions). The first of those circumstances is the existence of "a politically cohesive, geographically insular minority group." *Id.* at 49. The Court explained this precondition further, as follows:

> The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they *cannot claim to have been injured by that structure or practice*. The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected. Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure.

*Id.* at 50 n.17 (second emphasis supplied); *see also id.* at 49–50 (pointing out "that the greater the degree to which the electoral minority is homogeneous and insular and the greater the degree that bloc voting occurs along majority-minority lines, the greater will be the extent to which the minority's voting power is diluted by multimember districting" (quoting *Mobile v. Bolden*, 446 U.S. 55, 105 n.3 (1980) (Marshall, J., dissenting)); *id.* at 51 n.15 ("It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.' § 2(b)."); *see also Growe v. Emison*, 507 U.S. 25, 40–41 (1993) (noting that "the reasons for the three *Gingles*

prerequisites continue to apply"—including the "'geographically compact majority' and 'minority political cohesion' showings," which help "establish that the minority has the potential to elect a representative of its own choice in some single-member district," failing which "there *neither has been a wrong nor can be a remedy*" (emphasis supplied)).

Indeed, in the context of section two's dilution analysis, the U.S. Supreme Court has consistently required geographic compactness in defining the minority group whose voting power is to be protected. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 432 (2006) ("*LULAC*") (explaining that the trial court erred by basing its assessment of a district's performance on "aggregating the voting strength of [] two groups of Latinos," which otherwise "would allow a Latino-preferred candidate to prevail in elections," because that "general finding of effectiveness cannot substitute for the lack of a finding on compactness"). Limiting the VRA's protection—and the FDA's as well—to a geographically compact minority group makes sense. Doing so recognizes "that members of geographically insular racial and ethnic groups frequently share socioeconomic characteristics, such as income level, employment status, amount of education, housing and other living conditions, religion, language, and so forth." *Gingles*, 478 U.S. at 64.

The Supreme Court, in turn, has applied the phrase "elect representatives of their choice"—as it appears in section two of the VRA—with a focus on the *naturally occurring* minority community within a *geographically compact area. Cf. Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (hereinafter *Shaw II*) ("If a § 2 violation is proved *for a particular area*, it flows from the fact that individuals *in this area* 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State." (internal citations omitted)); *id.* ("For example, if a geographically compact, cohesive minority population lives in [one geographic region], . . . [a district] that spans [another region] would not address that § 2 violation," because the "black voters of the [prior

25

geographic region] would still be suffering precisely the same injury that they suffered before [the new district] was drawn.").

Moreover, the Supreme Court rejects the use of a *non-geographically* based definition of the protected minority group. *See LULAC*, 548 U.S. at 432 (rejecting the trial court's approach, under which "a district would satisfy § 2 no matter how noncompact it was, so long as all the members of a racial group, added together, could control election outcomes"); *id.* at 433 ("The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring))).

Along these same lines, in *Miller v. Johnson*, the Supreme Court explained that the State's recognition of a racial minority in districting legislation may or may not be constitutional, depending on the circumstances:

> A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests. When members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes. But where the State assumes from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls," it engages in racial stereotyping at odds with equal protection mandates.

515 U.S. 900, 920 (1995) (internal citations and quotations omitted). As the Supreme Court later observed: "In the absence of this prohibited assumption [that all voters of a certain race think and act alike, regardless of their location], there is no basis to believe a district *that combines two farflung segments of a racial group with disparate interests* provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *LULAC*, 548 U.S. at 433–34 (emphasis supplied); *cf. Johnson v. De Grandy*, 512 U.S. 997, 1022 (1994) (finding fault in the fact that "the complaint alleges no facts at all about the *contours,*

26

*demographics, or voting patterns* of any districts outside the Dade County or Escambia County areas" (emphasis supplied)); *id.* at 1015 ("We would agree that where a State has split (or lumped) minority neighborhoods that would have been grouped into a single district (or spread among several) if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere in the jurisdiction, the inconsistent treatment might be significant evidence of a § 2 violation, even in the face of proportionality.")

Simply put, to obtain relief under section two, "a plaintiff must show, at a minimum, that the minority group is 'geographically compact.'" *Shaw II*, 517 U.S. at 916 (1996). ("Therefore where that district sits, there neither has been a wrong nor can be a remedy." (quoting *Growe*, 507 U.S. at 41)); *Abrams v. Johnson*, 521 U.S. 74, 91–92 (1997) ("As we have noted before, § 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.' And the § 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" (internal quotations and citations omitted)); *cf. Cooper v. Harris*, 581 U.S. 285, 305 (2017) ("When a minority group is not sufficiently large to make up a majority in a reasonably shaped district, § 2 simply does not apply."); *LULAC*, 548 U.S. at 431–32 (noting principle "that a plaintiff, to make out a § 2 violation, must show he or she is part of a racial group that could form a majority in a reasonably compact district").

We acknowledge that this quoted jurisprudence (from *Gingles* forward) developed in the context of section two and dilution claims, but we disagree with the plaintiffs in their contention that the *Gingles* precondition one, and the cases that subsequently apply it, cannot be applicable in a diminishment claim like the one they assert. Congress limited redistricting remedies *to prevent any demand for "proportional" representation*, which would likely violate non-minorities' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *Allen v. Milligan*, 599 U.S. 1, 19 (2023) ("*Gingles* has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our

understanding of Section 2 as *Gingles* construed it."). At its heart, the plaintiffs' claim is based on a false premise—prohibited by section two, in fact—that minority voters living hundreds of miles apart in totally different communities, not joined in any reasonably configured geographically area, are *entitled to proportional representation* merely because they were once included together in former CD-5 by court order for three election cycles. This is not what the technical term we have been discussing contemplates.

That term is "elect representatives of their choice." Section five did not include the phrase until 2006. It was against the legal landscape we just reviewed that the term, in almost identical form, was added to the section—indeed, for a similar purpose: to define the "denies or abridges the right to vote." *Cf. N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."); *see also Tomlinson*, 369 So. 3d at 1147 n.6 (observing that "technical legal words . . . are deemed to have been statutorily used as they [have been] legally defined," based on their "established legal meaning").

Even though section five has a different purpose and function compared to section two, the use of a reference to the opportunity or ability of minority voters to elect candidates of their choice is the same in both. Both sections guard against the denial or abridgment of the individual right to vote on account of race. Violations can take a variety of forms under both sections. When it comes to a practice like redistricting, though, Congress's use of the same text in both sections points to an intent that the benchmark for both dilution and diminishment is the same: the geographically compact Black community with shared interests and collective voting power.

We see no reason why the same principle should not also apply in the context of diminishment under our state constitution, especially given our supreme court's decisions in this area of the law. The protection afforded, then, by both the

VRA and the FDA, through their references to the ability "to elect the candidate of their choice," is of the voting power of "a politically cohesive, geographically insular minority group." The baseline or benchmark from which to measure diminishment starts with a naturally occurring, geographically compact community with inherent voting power—not a district drawn with the *purpose* of cramming in enough voters to meet a BVAP target. Without common interests and a shared history and socioeconomic experience, it is not a community that can give rise to a cognizable right protected by the FDA. In other words, it is the *community* that must have the power, not a district manufactured for the sole purpose of creating voting power.

We hasten to say, though, that the community-as-benchmark interpretation applies only to the term "elect representatives of their choice." The Supreme Court applied that term in *Gingles* in the context of section two's mention of "less opportunity than other members of the electorate." From there, it derived the concept of "dilution," which the Court held required the existence of a potential majority-minority district. The term's use in the context of section five's mention of "diminishing the ability" does not change the benchmark—the identifiable Black community— only the starting point for measuring the strength of that community's voting power.

This view dovetails with the Florida Supreme Court's reading of the FDA to mean that the benchmark from which to measure claimed "retrogression" can be a majority-minority district, coalition district, *or* crossover district. *Apportionment I*, 83 So. 3d at 625.[14] As the supreme court noted, there is no right

---

[14] In a majority-minority district, "a minority group composes a numerical, working majority of the voting-age population." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). An "influence district" is one "in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Id.* A "crossover district" is "[l]ike an influence district" in that "minority voters make up less than a majority of the voting-age population," but "the minority population, at least potentially, is [still] large enough to elect the candidate of its choice with help from voters who are members of

29

under section two of the VRA against dilution if there is not a potential majority-minority district. *Id.* at 623 ("The showing of either an additional minority influence district or a crossover district, as opposed to an actual majority-minority district, is insufficient for Section 2 purposes; what is required is that 'the minority population in the potential election district [be] greater than 50 percent.'" (quoting *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009) (plurality opinion))); *see also Cooper*, 581 U.S. at 305 (characterizing the statement in *Bartlett* to mean that "[w]hen a minority group is not sufficiently large to make up a majority in a reasonably shaped district, § 2 simply does not apply").

At the same time, the supreme court recognized that even in the absence of a potential majority-minority district, there still could be a diminishment claim under the latter part of the FDA if a new districting regime reduces the minority group's performance with respect to the candidate of its choice, presumably either through influence or with cross-over help. *See Apportionment I,* 83 So. 3d at 625; *cf. Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (noting that "the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim" and explaining that under the "first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing the influence-dilution claim we assume, *arguendo,* to be actionable today"). In the example just quoted from *Voinovich*, "[t]he complaint in such a case is not that black voters have been deprived of the ability to constitute a *majority,* but of the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority." *Id.*

All we add to this—in the context of having to actually interpret the text in a case that demands the interpretation for a disposition—is the principle that a challenger cannot simply point to the existence of a Black performing district, without more, and have that serve as a benchmark for a diminishment

the majority and who cross over to support the minority's preferred candidate." *Id.*

claim. In asserting their rights under the FDA, the plaintiffs must establish they are part of a "geographically compact" community (rather than several "farflung" ones artificially brought together). From there, they must demonstrate that the naturally occurring community of which they are a part achieved some cohesive voting power under a legally enforceable district. That will be their benchmark. To prove their diminishment claim under the FDA, they will have to bring forward evidence that shows that the community's voting power decreased under the new districting enactment.

The plaintiffs failed to present any evidence of the existence within former CD-5 of such a geographically compact community, as we described; and the trial court did not demand it. In fact, it erroneously allowed the parties to stipulate this threshold element out of existence. They instead simply relied on the mere existence of former CD-5 as a Black performing district as a basis for using it as a benchmark. The district, of course, clearly pulled from "two farflung segments of a racial group with disparate interests." *LULAC,* 548 U.S. at 434. As a legal matter, this was not enough. There was no evidentiary basis for the conclusion that CD-5 afforded a legally cognizable Black community (as the parameters for such have been set out here) voting power that it did not otherwise have. The plaintiffs then failed to prove a proper benchmark or baseline from which to assess an alleged diminishment in voting power. They failed to submit any evidence as to this essential element of their claim under the FDA. The trial court should have dismissed the plaintiffs' suit for lack of proof.

REVERSED.

ROBERTS, ROWE, WINOKUR, M.K. THOMAS, and LONG, JJ., concur.

OSTERHAUS, C.J., concurs in result only with an opinion in which ROBERTS, M.K. THOMAS, and LONG, JJ., join.

WINOKUR, J., concurs with an opinion in which B.L. THOMAS and TANENBAUM, JJ., join.

31

LONG, J., concurs with an opinion in which B.L. THOMAS, ROBERTS, and M.K. THOMAS, JJ., join.

BILBREY, J., dissents with an opinion in which KELSEY, J., joins.

LEWIS, RAY, and NORDBY, JJ., recused.

———————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————

OSTERHAUS, C.J., concurring.

I concur with the result reached by our court but for federal equal protection-related reasons. I agree as a threshold matter with my colleagues' conclusion that Appellees' standing arguments lack merit. The State parties were legally obliged to follow both state and federal law in their redistricting work, including federal equal protection law. And just as the Legislature and Governor cannot ignore the United States Constitution in this work, courts reviewing their work cannot set aside federal law either. *See* Art. VI, U.S. Const. (directing that the "Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

Turning to the merits, I think the trial court erred by elevating state law in a vacuum and disregarding the federal parameters binding upon Florida's redistricting work. Drawing a North Florida congressional district to ensure wins for the preferred candidate of black voters, as required by the Fair Districts Amendment's (FDA) diminishment clause, Art. III, § 20, Fla. Const., is only permissible under federal equal protection principles if current evidence validates the need for a strong-medicine remedy to combat pervasive and purposeful discrimination. No such evidence exists here to support a 2020s-era diminishment clause-based remedy. Thus, I cannot affirm the

32

trial court's decision to enforce the diminishment clause, to vacate the existing enacted map, or to order the map strategically redrawn so that Congressional District 5's (CD-5) black voters will continue winning elections in the 2020s.

A.

Under *state law*, the Legislature's task of drawing congressional districts after the 2020 census came with an FDA requirement to ensure that minority voters in North Florida's CD-5 would continue electing the representative of their choice. Art. III, § 20, Fla. Const. (requiring that "districts shall not be drawn with the . . . result of . . . diminish[ing the] ability [of racial minorities] to elect representatives of their choice"); *see also In re Senate Joint Resolution of Legislative Apportionment 100*, 334 So. 3d 1282, 1289 (Fla. 2022) (interpreting the FDA's diminishment clause to prohibit the Legislature from "weaken[ing] [a] historically performing minority district where doing so would actually diminish a minority group's ability to elect its preferred candidates" (quoting *In re Senate Joint Resolution of Apportionment 1176 (Apportionment I)*, 83 So. 3d 597, 625 (Fla. 2012))). Black voters in CD-5 had elected their choice congressional candidate in the three most-recent general elections. And under these circumstances the FDA required that 2020s-cycle redistricting lines be drawn to protect those voters' ability to continue electing their candidate of choice. Of course, compliance with the diminishment clause and its race-preferential ground rule also meant locking in—on the basis of race—election futility for thousands of other district voters who prefer other candidates. These voters would stand little chance of electing their choice of candidate after a strategic, clause-directed "effort to 'segregate . . . voters' on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (O'Connor, J.) (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960)).

The FDA wasn't, however, the only legal standard regulating the Legislature's post-2020 redistricting work. *Federal law*—"the supreme Law of the Land," Art. VI, U.S. Const.—sets strict parameters upon states that would draw or redraw congressional districts on the basis of race. Appellees demanded under the FDA that the trial court enforce a legal guarantee of electoral success

33

in favor of CD-5's black voters to the detriment of other voters (while also subordinating traditional race-neutral districting principles (like compactness) that the FDA relegates to tier 2 status). Because so incorporating a diminishment clause-based remedy into North Florida's 2020s redistricting process required "district lines [to be] obviously drawn for the purpose of separating voters by race[,] . . . careful scrutiny [was required] under the Equal Protection Clause regardless of the motivations underlying their adoption." *Shaw*, 509 U.S. at 645; *see also* Amend. XIV, § 1, U.S. Const. (Equal Protection Clause) (forbidding States to "make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws"). Under federal electoral parameters Florida couldn't undertake line-drawing favoring the choice candidate of CD-5's black voters without scrutinizing that work under federal equal protection principles.

In most circumstances the "Equal Protection Clause prohibits a State, without sufficient justification, from 'separating its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). In fact, we consider such "[c]lassifications of citizens solely on the basis of race [to be] '. . . by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw*, 509 U.S. at 643 (quoting *Hirabayashi v. United States,* 320 U.S. 81, 100 (1943)); *see also LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part and dissenting in part) (recognizing "a sordid business, this divvying us up by race"). Because the FDA's diminishment clause would apply an overtly race-based redistricting scheme, the Legislature and Governor had to decide in 2022 if federal law permitted them to divvy up North Florida voters into districts by race. *See Advisory Opinion to the Governor re Whether Article III Section 20(a) of the Florida Constitution Requires the Retention of a District in Northern Florida*, 333 So. 3d 1106 (Fla. 2022) (requesting an advisory opinion from the Florida Supreme Court specifically relating to the constitutionality of redistricting CD-5); art. VI, U.S. Const.; Candidate Oath, § 99.021, Fla. Stat. (requiring legislators and officers by oath to "support [*both*] the Constitution of the United States and the Constitution of

34

Florida"); s*ee also Bethune-Hill*, 580 U.S. at 187 (recognizing electoral districting to be "a most difficult subject for legislatures" because of "competing considerations" (quoting *Miller*, 515 U.S. at 915)). They concluded that they couldn't both apply the diminishment clause in favor of CD-5's black voters and satisfy federal prohibitions against race-based district line-drawing. Consequently, their 2022 enacted map drew more regular, traditional-looking district lines in North Florida that didn't keep together black voters from the former CD-5—an oddly elongated, handlebar-mustache-looking, Jacksonville to Gadsden County district. *See* ch. 2022-265, Fla. Laws (2022); § 8.0002, Fla. Stat. (2022).

B.

And so, now, Appellees' challenge tees up the question of whether the State parties had to carry out the FDA diminishment clause's minority-voter, candidate-preference mandate in this redistricting cycle. Appellees argue that the court's analysis should ignore elephant-in-the-room federal law problems with the FDA's diminishment clause for standing and other reasons. But the Supremacy Clause and our own cases eliminate this path as a credible option. *See, e.g., Jones v. Grace Healthcare*, 320 So. 3d 191 (Fla. 1st DCA 2021) (recognizing that we are "oath-bound to follow" extant federal law). Alternatively, Appellees ask us to affirm the trial court's order requiring the Legislature and Governor to redraw the congressional map in compliance with the FDA because the diminishment clause is tantamount to applying section 5 of the Voting Rights Act of 1965 and comports with federal law. *See* 52 U.S.C. § 10304(b). Indeed, the Florida Supreme Court recognized that the FDA's diminishment clause is modeled on Section 5 and "guided by [its] prevailing United States Supreme Court precedent." *Apportionment I*, 83 So. 3d at 620. Here, I agree that a close look at section 5 and its corresponding precedent is not only important, but ultimately determinative.

Congress enacted Section 5 under the Fifteenth Amendment provision authorizing "appropriate" legislation to secure the rights of all citizens to vote, regardless of race. "Section 5 was directed at preventing a particular set of invidious practices that

35

had the effect of 'undoing or defeating the rights recently won by nonwhite voters.'" *Miller*, 515 U.S. at 925 (quoting a House report from 1969); *see also Shaw*, 509 U.S. at 639–41 (describing ugly patterns of pervasive racial discrimination leading to the enactment of the Voting Rights Act). Congress targeted Section 5 against particular states and jurisdictions where egregious discrimination and the circumvention of courts made "case-by-case litigation . . . inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits." *South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1966). Neither the State of Florida nor jurisdictions in North Florida were covered by it. When the United States Supreme Court first addressed Section 5's constitutionality, it justified the Act's perverse and substantial cost to equal protection in view of the exceptional conditions on the ground at that time, "systematic resistance to the Fifteenth Amendment," and "obstructionist tactics." *Id.* at 318, 328, 334. It considered Section 5 to be a necessary "emergency" remedy because of the "unremitting and ingenious defiance of the Constitution" and courts, in a context where "Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Id.* at 308-09. Under those circumstances, the Court upheld the Act. And Congress subsequently renewed Section 5's application a few times over the following decades, bringing vast electoral progress across the nation.

With the passage of time and improved voting conditions, however, the evidence weakened for continuing to give Section 5-based preferences to minority voters and their candidates of choice. By the 1990s and early 2000s, the United States Supreme Court began warning that Fifteenth Amendment, race-based districting practices were increasingly problematic under the Fourteenth Amendment. *Miller*, 515 U.S. at 926-27. The Court developed "serious misgivings about the constitutionality of Section 5." *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009). And it took the view that "the Act imposes current burdens and must be justified by current needs."

*Id.* at 203; *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard*, 600 U.S. 181, 207 (2023) (allowing the use of racial categories if "remediating *specific, identified instances of past discrimination* that violated the Constitution or a statute" (emphasis added); *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) (recognizing that "appropriate" remedial legislation has "a congruence and proportionality" to the constitutional violations it is supposed to fix). Justice Thomas explained the need to reevaluate current evidence underlying Section 5's remedial scheme in these terms:

> The extensive pattern of discrimination that led the Court to previously uphold § 5 as enforcing the Fifteenth Amendment no longer exists. Covered jurisdictions are not now engaged in a systematic campaign to deny black citizens access to the ballot through intimidation and violence. . . . The lack of sufficient evidence that the covered jurisdictions currently engage in the type of discrimination that underlay the enactment of § 5 undermines any basis for retaining it. . . . Without such evidence, the charge can only be premised on outdated assumptions about racial attitudes in the covered jurisdictions.

*Northwest Austin,* 557 U.S. at 226 (Thomas, J., concurring in part and dissenting in part).

Ultimately, in *Shelby County v. Holder*, the Court invalidated Section 5's coverage formula because current evidence failed to support its fixed-formulaic application to the covered jurisdictions. *Shelby County v. Holder*, 570 U.S. 529 (2013). *Shelby County* explained:

> The Government's [case] does not even attempt to demonstrate the continued relevance of the formula to the problem it targets. And in the context of a decision as significant as this one—subjecting a disfavored subset of States to "extraordinary legislation otherwise unfamiliar to our federal system," *Northwest Austin, supra*, at 211—that failure to establish even relevance is fatal.

37

> Regardless of how to look at the record, however, no one can fairly say that [the evidence] shows anything approaching the "pervasive," "flagrant," "widespread," and "rampant" discrimination that faced Congress in 1965, and that clearly distinguished the covered jurisdictions from the rest of the Nation at that time. *Katzenbach, supra*, at 308, 315, 331; *Northwest Austin*, 557 U.S., at 201.

*Id.* at 552, 554.

Section 5's legal history, and particularly *Shelby County*'s prevailing demand that current evidence must justify the use of a race-based remedial scheme, applies directly here. For Florida now to employ its fixed and indefinitely applicable Section 5-based diminishment clause remedy requires a sturdy, equal protection-satisfying rationale backed by current evidence of pervasive and purposeful discrimination. *See id.*; *Northwest Austin*, 557 U.S. at 202; *Shaw*, 509 U.S. at 657 (recognizing that "[r]acial gerrymandering, even for remedial purposes, . . . threatens to carry us further from the goal of a political system in which race no longer matters"). In other words, the State parties here weren't simply free to draw the 2022 map with diminishment clause-directed lines in the context of an evidentiary vacuum.

## C.

Here stands my problem with Appellees' case and the trial court's order. The record in this case lacks evidence of pervasive and purposeful racial discrimination sufficient to warrant the intentional drawing of a diminishment clause-based winning district for CD-5's black voters. Appellees point to no evidence that approaches, for instance, what supported the Voting Rights Act of 1965 itself. *See Katzenbach*, 383 U.S. at 308 (highlighting that "[t]he constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience [and Congress's voluminous record] explor[ing] with great care the problem of racial discrimination in voting. The House and

Senate Committees on the Judiciary each held hearings for nine days and received testimony from a total of 67 witnesses . . . while the debate in the Senate covered 26 days in all"). Along this line, there is no evidence suggesting that the FDA's sponsors undergirded the 2010 initiative process with up-to-date facts comparable to Congress's work. Nor do we have a record of pervasive and purposeful discrimination evidence being provided to Florida's voters or being shown to have motivated them to pass the FDA. *See Advisory Opinion to the Attorney General re Standards for Establishing Legislative District Boundaries*, 2 So. 3d 175 (Fla. 2009) (making no mention of evidence justifying a Section 5-based diminishment clause remedy). Likewise, Appellees' current litigation doesn't supply an up-to-date case record of pervasive and purposeful racial discrimination substantiating the need for a drastic Section 5-based remedy. Rather, the part of Appellees' brief addressing "specific (and recent) history of utilizing discriminatory election practices" cites to court cases beginning in 1945 and ending thirty years ago (also referencing allegations made in a case twenty years ago that a court didn't pass upon).

The absence of discrimination evidence in this case "is plainly insufficient to sustain such an extraordinary [Section 5-based] remedy" as advocated by Appellees under the diminishment clause. *Northwest Austin*, 557 U.S. at 228 (Thomas, J., concurring in part and dissenting in part). Because application of the diminishment clause isn't justified by evidence of "current needs," it cannot be considered an appropriate "strong medicine" remedial option in this redistricting cycle. *Shelby County*, 570 U.S. at 535–36. While "exceptional conditions can justify legislative measures not otherwise appropriate," *id.* at 535 (quoting *Katzenbach*, 383 U.S. at 334), Appellees fail to show exceptional conditions validating their argument for redrawing the 2022-enacted maps to favor the candidates of CD-5's black voters. Thus, I cannot conclude that the Legislature and Governor got their recent redistricting work wrong when they declined to apply the clause's Section 5-based diminishment remedy in North Florida. *Cf. Dep't of Fin. Servs. v. Danahy & Murray, P.A.*, 246 So. 3d 466, 468–69 (Fla. 1st DCA 2019) (recognizing that the legislature's work comes to the court "clothed with a presumption of constitutionality").

\*　　　\*　　　\*

To sum up, when the time came for Florida to draw new congressional district lines after the 2020 census, the FDA's diminishment clause could only require the purposeful redrawing of a black-voter performing district across North Florida if evidence showed a compelling remedial need for it. The Legislature and Governor identified no voting discrimination-based justification for drawing such a district. They settled instead on a traditional-looking map that eliminated the previous cycle's 200-mile-long, Jacksonville-to-Gadsden County, handlebar-mustache-looking district that had performed for black voters in three prior elections. Now, in this legal challenge to the State parties' redistricting efforts, Appellees haven't shown that it was legally permissible for them, much less required, to draw lines so that a North Florida district will perform for black voters. Given the evidentiary vacuum, courts have no basis to impose a Section 5-based diminishment clause remedy in this litigation. To do so would violate federal equal protection principles. Accordingly, I see no diminishment clause-based basis for vacating the map enacted in 2022, or to order the map redrawn so that CD-5's black voters can elect their preferred candidate in this decade's elections.

WINOKUR, J., concurring.

The dissent contends that we have "deviated from past practice" in choosing to exercise our constitutionally derived jurisdiction in this case rather than to pass this appeal to the supreme court pursuant to article V, section 3(b)(5) of the Florida Constitution. This claim implies that we have an obligation to yield our own jurisdiction to the supreme court for resolution. I disagree.

As a preliminary matter, it cannot be denied that this Court is the court with jurisdiction to hear this appeal. Art. V, § 4(b)(1), Fla. Const. While we certainly have constitutional authority to certify this appeal to the supreme court for resolution, we are the court the constitution has designated to hear this appeal. And I am unconvinced that we had an obligation to surrender that jurisdiction.

40

First, the "past practice" we have purportedly deviated from is application of the so-called "three-part test" of *Harris v. Coal. to Reduce Class Size*, 824 So. 2d 245 (Fla. 1st DCA 2002), which notes that we are to determine "whether (1) the order or judgment is appealable; (2) the issues raised 'are of great public importance' or are likely to 'have a great effect on the proper administration of justice throughout the state'; and (3) circumstances exist which require that the supreme court immediately resolve the issues, rather than permitting the normal appellate process to run its course." *Id.* at 246–47. But this is not a "test" set forth in case law; it is simply a restatement of the requirements of section 3(b)(5).[1] We *may* certify the appeal to the supreme court in accordance with section 3(b)(5), but our decision to do so is an administrative assessment on our part. We are not violating case law if we choose not to certify; we are merely exercising our constitutional duty to hear an appeal within our jurisdiction and exercising our discretion not to send the case to the supreme court.

Second, the dissent's argument presumes that the conclusion of this proceeding will inevitably result in action by the Florida Legislature in its 2024 session, and for this reason immediate resolution is required. I harbor doubts that this suit will end with this appeal, whether heard in this court or in the supreme court, so the contention that the parties need the case to be resolved before the legislative session seems dubious.

But even if this doubt were unfounded, even if it were certain that the Florida Legislature would act in its 2024 session based on the outcome of this proceeding, and that this certainty meant that the case needs immediate resolution, I still cannot agree that we had an obligation based in case law to certify this case for the supreme court's resolution under section 3(b)(5). I do

---

[1] The supreme court "[m]ay review any order or judgment of a trial court certified by the district court of appeal in which an appeal is pending to be of great public importance, or to have a great effect on the proper administration of justice throughout the state, and certified to require immediate resolution by the supreme court." Art. V, § 3(b)(5), Fla. Const.

not dispute that the order under review is "of great public importance," but I fail to discern any reason why this fact creates a basis for us to give up our constitutional obligation to decide this appeal in favor of the supreme court. Nothing in the constitution implies that a district court of appeal ever has an affirmative obligation to certify a case to the supreme court, be it a certification pursuant to section 3(b)(4)[2] or section 3(b)(5).

I respect my dissenting colleague's view that this appeal should have been certified to the supreme court, but disagree. But because the decision to pass an appeal within our jurisdiction to the supreme court under section 3(b)(5) is an internal administrative determination, I reject even an implication that this court could ever abuse its discretion in choosing not to do so, under the constitution or under case law.

LONG, J., concurring.

I concur in the Court's decision but write separately to discuss an alternative interpretation of article III, section 20.

On November 2, 2010, Florida voters adopted a constitutional amendment to address congressional redistricting. Florida courts have only addressed the newly adopted provisions in a handful of cases. And none has addressed how the provisions should be read in light of existing equal protection requirements. We should take on that question and, as is our duty, construe the provision in harmony with existing constitutional requirements.

As adopted, the constitutional provision says:

> In establishing congressional district boundaries:

---

[2] Article V, section 3(b)(4) gives the supreme court jurisdiction to review decisions certified by district courts of appeal to be of great public importance or to be in conflict with a decision of another district court of appeal.

(a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.

(b) Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c) The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

Art. III, § 20, Fla. Const.

The constitutional amendment contains several new redistricting requirements. This case turns on the middle clause in subsection (a), which prohibits the drawing of congressional districts "with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice." On its face, this provision does two things. It ensures that racial and language minorities receive an equal opportunity to participate in the political process and to elect representatives of their choice. The federal courts often refer to these two concepts as dilution and retrogression. As we sort through what they mean in the context of the Florida Constitution, we will call them the process and weight requirements.

No Florida court has directly adjudicated a dispute on this part of the amendment, but our supreme court has spoken generally to the provision. *See In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 619 (Fla. 2012) (comparing the provision to similar language in the VRA). Though issued as a general discourse on the new constitutional provisions and not as an exercise of its judicial adjudicatory power (*i.e., obiter dictum*), the supreme court has suggested that interpretation of article III, section 20 be guided by federal VRA jurisprudence. *Id.* at 620 (noting that Florida's provision is "[c]onsistent with the goals of Sections 2 and 5 of the VRA").[1] In providing a general discussion about the process and weight requirements, the supreme court did not attempt to evaluate the provisions by considering their place and context in the broader Florida Constitution. Instead, it simply pointed out the similarities to the VRA. Presumably the supreme court did not engage in a deeper analysis on this question because the discussion was unrelated to the case before it. But now we have a live dispute before us and Appellants have argued that if we read the VRA provisions, along with all their federal court baggage, into article III, section 20, the result is a provision inconsistent with our equal protection guarantee.[2]

The supreme court understands our independent duty and, even while suggesting the use of the VRA's interpretive principles, also recognized that article III, section 20 is different from the VRA and other states' similar provisions. "Florida's

---

[1] To the extent that the supreme court intended to fully adopt federal VRA jurisprudence, Chief Judge Osterhaus and Judges B.L. Thomas and Tanenbaum have thoughtfully explained why the trial court's final judgment should still be reversed.

[2] While Secretary Byrd points out that Florida has its own equal protection provision, the argument is primarily presented via federal equal protection. We can, however, fully resolve this case on Florida constitutional grounds.

provision is unique among the states in that it incorporates language from the VRA but does not explicitly reference the VRA." *Id.* That is to say that Florida law is different from federal law. And in interpreting Florida law, we keep in mind that "lockstepping [with federal law] disregards [the] state's particular history, linguistics, norms, and intratextual analysis." Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law*, 132 HARV. L. REV. 811, 818 (2018). Understanding this, the supreme court explained that we have an independent duty to interpret our own constitution.[3] *See In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 621 ("The Court nonetheless recognizes our independent constitutional obligation to interpret our own state constitutional provisions.").[4] Consistent with these principles, we should endeavor to interpret article III, section 20 faithfully and independently. This requires carefully reviewing its text and context. We must consider the original public meaning of the text and seek to read the provision harmoniously with article I, section 2.

---

[3] "[A]n underappreciation of state constitutional law has hurt state *and* federal law and has undermined the appropriate balance between state *and* federal courts in protecting individual liberty." Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 6 (2018). "Nothing compels the state courts to imitate federal interpretations . . . when it comes to the rights guarantees found in their own constitutions, even guarantees that match the federal ones letter for letter." *Id.* at 16.

[4] It also reinforces the distinctiveness of federal law and Florida law that two cases are simultaneously proceeding at this very time regarding this same congressional redistricting. The federal courts will ultimately determine what the federal constitution and VRA require. Florida courts will determine what the Florida Constitution requires.

We begin with article I, section 2. Article I sets out our Declaration of Rights. Article I, section 2 contains our "[b]asic rights" and says that "[a]ll natural persons . . . are equal before the law" and that "[n]o person shall be deprived of any right because of race." Quite simply, article I, section 2 requires that the law treat everyone equally regardless of race. This is a bedrock, fundamental tenet of our republic. It is our "basic right."

We see that article III, section 20 does not exist in a vacuum. It is found in a constitution that expressly prohibits race-based deprivations. Yet Appellees argue the provision requires racial balkanization. There is no indication *anywhere* to suggest that article III, section 20 was meant to undermine or limit our "basic rights" found in article I, section 2. And so it must be read and interpreted in light of article I, section 2 and the rest of the Florida Constitution.

The harmonious-reading canon states that the "provisions of a text should be interpreted in a way that renders them compatible, not contradictory." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012). "[O]ne part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 58 (1868). "The imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves." Scalia & Garner, *supra*, at 180. We, of course, assume the people of Florida are intelligent and intentional in their adoption of constitutional amendments. Without any indication that article III, section 20 was meant to subvert our basic equal protection rights, we must read the two provisions harmoniously. And we need not contort the language to do so. As we have already pointed out, the provision is addressed to two subjects—equal process and equal weight—neither of which conflicts with equal protection.

Experienced election lawyers who have spent careers litigating the morass of the VRA may instinctively view article III, section 20 through the lens of federal law. But article III, section 20 was adopted by millions of ordinary Florida voters, not by highly specialized election lawyers. And so we must give the text its ordinary public meaning. That is our duty. "In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *D.C. v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in judgment) ("When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted."). "The ordinary-meaning rule is the most fundamental semantic rule of interpretation." Scalia & Garner, *supra*, at 69. "Interpreters should not be required to divine arcane nuances or to discover hidden meanings." *Id.*

> [E]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings.

Joseph Story, *Commentaries on the Constitution of the United States* 157–58 (1833). Below we will examine more closely the ordinary meaning of "political process" and "ability to elect representative of their choice." But before we do, we will look to the broader context.

Ballot language is a useful contextual tool when evaluating the original public meaning of constitutional language adopted by plebiscite. It was the vehicle used to explain the amendment to the voters who adopted it. Ballot language cannot be used to trick voters into adopting provisions with hidden meanings. And so we must ask whether a proposed interpretation aligns with a facial review of the ballot language. Here, we examine for any indication that the amendment would require Appellees' proposed race-based voter segregation. The ballot explained the constitutional amendment in this way:

> Congressional districts or districting plans may not be drawn to favor or disfavor an incumbent or political party. Districts shall not be drawn to deny racial or language minorities the equal opportunity to participate in the political process and elect representatives of their choice. Districts must be contiguous. Unless otherwise required, districts must be compact, as equal in population as feasible, and where feasible must make use of existing city, county and geographical boundaries.

*See Advisory Opinion to Att'y Gen. re Standards For Establishing Legis. Dist. Boundaries*, 2 So. 3d 175, 180 (Fla. 2009). We find nothing to support Appellees' proposed interpretation. The diligent voter that read the amendment's text, and the ballot language explaining it, would have no reason to suspect that it would lock in racial gerrymanders in perpetuity. There was nothing to suggest the amendment would require the legislature to focus on racial demographics and voting patterns or to carve up neighborhoods and communities to ensure one racial group prevails over another. The people could not have known all this because it is plainly not there. Appellees only find it by imposing "arcane nuances" and "hidden meanings" on the otherwise commonplace language.[5] Voters were asked if they wanted to

---

[5] Even assuming the phrases are taken from the VRA and have known meanings, we still must ask: known to whom? We are duty-bound to give the language its original public meaning. To the extent that VRA jurisprudence is coherent at all, the phrases might be known only to a handful of election lawyers around the state. The amendment process cannot be used to

amend their constitution to prohibit the drawing of districts that would "deny racial or language minorities the equal opportunity to participate in the political process and elect representatives of their choice." That's it.

As we see below, the original public meaning of the provision was a complement to the existing constitutional demand for equal protection under the law. Equal process and equal weight for all. Having made harmonious-reading and ordinary-meaning considerations, we now seek to faithfully interpret the provision in light of them.

*The Process Requirement*

The process requirement is the guarantee of "equal opportunity of racial or language minorities to participate in the political process." We consider what an ordinary voter would understand the word "process" to mean. Process is commonly defined as a "series of actions or steps taken in order to achieve a particular end." *Process*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010); *see also Process*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) (defining process as "a series of actions or operations conducing to an end"). There is no indication from the text or context that the language used was intended to mean something other than this ordinary definition. The original public meaning, therefore, of participation in the "political process" is the actions and operations associated with voting. It deals with the "methods for conducting a part of the voting process that might . . . be used to interfere with a citizen's ability to cast his vote." *Holder v. Hall*, 512 U.S. 874, 917–18 (1994) (Thomas, J., concurring in judgment). Such as "registration requirements, . . . the locations of polling places, the times polls are open, the use of paper ballots as opposed to voting machines, and other similar aspects of the voting process." *Id.* at 922. The process requirement "focuses on ballot access and counting." *Allen v. Milligan*, 599 U.S. 1, 46 (2023) (Thomas, J., dissenting). The process requirement guarantees equal

_____

hoodwink millions of Florida voters through bait-and-switch lawyer-speak.

treatment in all aspects of the voting process, from registration to ballot counting and everything in between.

### *The Weight Requirement*

The weight requirement is the guarantee that a racial or language minority does not have a diminished "ability to elect representatives of their choice." There is no serious dispute about the meaning of the words used in this portion of the provision. Everyone agrees it cannot mean an individual has a right to elect his candidate of choice. This of course is impossible. But the language does not suggest that reading anyway. The provision, especially when viewed together with the ballot language and article I, section 2, guarantees an equal, that is, non-diminished, ability to elect your candidate of choice. This provision is Florida's version of one person, one vote. It constitutionalizes "the fundamental principle of representative government . . . of equal representation for equal numbers of people, without regard to race." *Reynolds v. Sims*, 377 U.S. 533, 560–61 (1964). It prohibits "[w]eighting the votes of citizens differently, by any method or means." *Id.* at 563. This could be violated where minority voters are packed into higher population districts while non-minority voters are drawn into lower population districts. In such a case, the minority voter's vote would have a diminished weight when compared to a non-minority counterpart. Equal process and equal weight.

Reading the provision this way is faithful to the text and to its place in the broader constitution. It reads article III, section 20 as a complement to article I, section 2, rather than in conflict. To guarantee racial and language minorities receive an equal opportunity to participate in the political process. And to ensure an equal ability (one that is not diminished as compared to non-racial and non-language minorities) to elect representatives of their choice.

Appellees argue we must construe the weight requirement as the federal courts have interpreted similar language in the VRA. They suggest the language prohibits redistricting that reduces the number of majority-minority racial districts. In effect, they argue the provision requires the continued racial segregation of

50

voters. But there is no evidence that the people of Florida intended to adopt "the sordid business of divvying us up by race." *Allen v. Milligan*, 599 U.S. 1, 86 (2023) (Thomas, J., dissenting) (internal quotations omitted). Appellees' proposed interpretation thwarts article I, section 2. So it must be rejected.

Along with its manifest conflict with article I, section 2, we pause here to discuss two other problems with Appellees' proposed construction. First, constitutional rights are individual rights. They are not rights conveyed to discrete racial or ethnic groups. The prohibition on the diminishment of racial minorities' ability to elect representatives of their choice is a protection for individual voters. Yet, without a basis in the text, Appellees' interpretation improperly treats minority voters as a monolith. No amount of clever legal-speak and rationalization can escape this. It steals the individual right of a minority voter to be protected from race-based disenfranchisement and exchanges it for race-based voter segregation. The provision must instead be read to convey a right of equal voting access to *individuals*.[6]

Second, the term "diminish" requires a point of reference— diminished as compared to what? Appellees' interpretation fails

_____

[6] No measure of black voting patterns has ever revealed 100% black voter solidarity on candidates. This puts the lie to Appellees' proposed interpretation. Even assuming 90% consistency in black voting patterns, it necessarily means that 10% of black voters have been intentionally deprived of the ability to elect a representative of their choice based on their race. Instead of their constitutional right to vote in a fair district made up of a broad swath of the greater community, they are swept into racially segregated districts and intentionally denied any meaningful chance to elect their representatives of choice. And it is only under Appellees' proposed interpretation that voters are disenfranchised based on their race. Under race-blind redistricting, voters never win or lose on account of their race. Any regime that racially marginalizes voters is unconstitutional and patently unjust. Treating citizens as individuals without regard for race is the only way to ensure full and equal participation in the political process.

51

here too because it requires a comparison to a previous district's racial makeup. This interpretation is stuck looking backwards and can never get to the central point of the provision—ensuring all voters are treated equally. Instead, it turns the provision on its head. It fails because it converts a race-based prohibition into a race-based requirement. The constitution cannot demand that all voters are treated equally without regard to race and at the same time demand that voters are treated differently based on race.

Rather than read incompatibility into the provision, it should be read as a companion. The districts cannot be drawn to diminish an individual racial-minority-voter's ability to elect a representative of choice *as compared to* an individual non-racial-minority-voter. This is ultimately accomplished by ensuring all voters are treated equally without regard to race.

The harmonious-reading and ordinary-meaning canons are our basic interpretive tools. Their use is our duty. We are guided by the text. We read the text in its broader context. In doing so, we consider its public meaning at the time it was adopted. The amendment was adopted based on its anodyne ballot language and constitutional text. Rather than use our foundational interpretive tools, Appellees ask us to open the secret trap door and unleash the highly controversial and hotly disputed federal VRA jurisprudence into the Florida Constitution. We should decline that invitation.

### *Conclusion*

The Florida Constitution includes strong equal protection language and an express prohibition on the consideration of race. Article III, section 20 is a complement to that protection. A faithful reading requires us to "resolve these cases in a way that would not require the [Florida] Judiciary to decide the correct racial apportionment of [Florida's] congressional seats." *Allen v. Milligan*, 599 U.S. 1, 46 (2023) (Thomas, J., dissenting).

Article III, section 20 requires that racial and language minority voters receive an equal opportunity to participate in the political process and have a non-diminished ability to elect

representatives of their choice. The trial court erred in reading a racial segregation mandate into the constitutional provision. We are therefore correct to reverse the final order and remand to the trial court.

BILBREY, J., dissenting.

I respectfully dissent. As explained below, we should have passed this appeal through to the Florida Supreme Court for immediate resolution as the parties jointly requested. Barring that, we should affirm because the currently enacted congressional districts diminish Black voters' "ability to elect representatives of their choice" in violation of one of the Florida Constitution's Fair Districts Amendments when compared to the benchmark district the Florida Supreme Court previously approved. Art. III, § 20(a), Fla. Const. And there are or can be alternatives to the current districts, including two plans the Legislature already passed, that are constitutional under the Equal Protection Clause of the United States Constitution. U.S. const. amend XIV, § 1.

## We Should Have Passed the Appeal
## Through to the Florida Supreme Court

The trial court issued its 55-page final order after hearing and final judgment on September 2, 2023. The court determined that the currently enacted congressional redistricting plan in Laws of Florida, Chapter 2022-265, codified as section 8.0002(5), Florida Statutes (2023), violates the Fair Districts Amendment in article III, section 20 of the Florida Constitution. Appellants promptly filed their notice of appeal on September 4. Just four days later, Appellants and Appellees filed what was styled as "Joint Time-Sensitive Suggestion for Pass-Through Certification" asking us to certify the judgment for immediate resolution by the Florida Supreme Court.[1] *See* Art. V, § 3(b)(5), Fla. Const.; Fla. R. App. P. 9.125(c).

---

[1] We rarely see a suggestion for certification filed by a party. In my almost nine years on this court, this is the first time I recall receiving a joint suggestion for certification approved by all the parties to an appeal.

The parties explained clearly why we should have permitted the Florida Supreme Court to immediately take jurisdiction of the appeal. The "judgment on appeal addresses congressional redistricting issues of great public importance." The "appeal requires immediate resolution by the Florida Supreme Court to provide certainty to voters, potential candidates, and election officials regarding the configuration and validity of Florida's congressional districts sufficiently in advance of the 2024 elections."

Admittedly, the joint suggestion, compelling though it was, was not binding on us. Rather, the issues for our determination in deciding whether to pass the appeal through to the Florida Supreme Court were:

> whether (1) the order or judgment is appealable; (2) the issues raised "are of great public importance" or are likely to "have a great effect on the proper administration of justice throughout the state"; and (3) circumstances exist which require that the supreme court immediately resolve the issues, rather than permitting the normal appellate process to run its course.

*Harris v. Coal. to Reduce Class Size*, 824 So. 2d 245, 246–47 (Fla. 1st DCA 2002); *see also ACLU v. Hood*, 881 So. 2d 664, 666 (Fla. 1st DCA 2004). Under this test, and consistent with our past practice, we should have promptly certified the judgment for immediate resolution by the Florida Supreme Court.

The first prong of the *Harris* test was easily met. The final judgment from the trial court was appealable. *See* Fla. R. App. P. 9.030(b)(1)(A). Likewise as to the second prong from *Harris*, whether a congressional redistricting plan is unconstitutional is undoubtedly a matter of great public importance. *See League of Women Voters of Fla. v. Detzner*, 178 So. 3d 6, 7 (Fla. 1st DCA 2014) (certifying the judgment "declaring parts of the Florida Legislature's 2012 congressional redistricting plan unconstitutional" for direct review when the next election was "approximately two years away"). The Florida Supreme Court on this very question "acknowledge[d] the importance of the

54

issues presented." *Advisory Op. to the Governor Re: Whether Article III, Section 20(A) of the Fla. Const. Requires the Retention of a Dist. in N. Fla.*, 333 So. 3d 1106, 1108 (Fla. 2022).

Finally, the third prong of the *Harris* test was met here. The trial court's final judgment directs the Florida "House of Representatives and Senate to enact a remedial map in compliance with Article III, Section 20 of the Florida Constitution." The Florida Legislature is set to convene on January 9, 2024. *See* Art. III, § 3(b), Fla. Const. Qualifying in Florida for the United States House of Representatives starts on April 8, 2024. *See* § 99.061(8), Fla. Stat. (2023). The parties were correct when they cited *Hood* and stated that "[t]here is insufficient time for this court to provide a first-tier review prior to the issues being heard by the Supreme Court of Florida" if the appeal was going to be resolved in time for the 2024 election.[2] 881 So. 2d at 666; *see also Advisory Op. to the Governor*, 333 So. 3d at 1108 (recognizing the "need for quick resolution and finality" on the redistricting question now before this court).[3]

---

[2] The parties' stipulation before the trial court provided that if we granted pass-through certification to the Florida Supreme Court and the Court took up the appeal, "the Parties will propose a schedule that will permit resolution by the Florida Supreme Court by December 31, 2023, to allow the Florida Legislature to take up any remedial map, if necessary, during the 2024 legislative session beginning on January 9, 2024 for enactment no later than April 1, 2024."

[3] After we informed the parties that we were hearing this matter en banc, they provided a stipulation regarding the briefing schedule. They noted "that time is of the essence." They requested that we "dispense with oral argument and resolve this case on the briefs." Finally, in the stipulation the parties requested that we issue our opinion by November 22, 2023, to allow for Florida Supreme Court review and Legislative action if necessary "before the Legislature's scheduled adjournment on March 8, 2024."

In *Detzner* we certified the judgment, finding that it was of great public importance and required immediate resolution by the Florida Supreme Court, when the congressional election at issue was over two years away. 178 So. 3d at 6.[4] Here, there is much greater urgency to ultimately resolve the questions raised, with less than a month and half to the next Legislative session, less than five months until qualifying, and less than a year until the next congressional election. The 2022 election was already conducted under a map that the trial court found violated Fair Districts. *See Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 339 So. 3d 1070, 1074 (Fla. 1st DCA 2022).[5] Our action in delaying Florida Supreme Court review risks having the 2024 House of Representatives election being conducted again under a map of dubious constitutionality.

We knew when the suggestion for pass-through was before us in September that the Florida Supreme Court would likely have jurisdiction no matter how we ruled on the appeal. The majority opinion provides the Supreme Court with various bases for jurisdiction. *See* Art. V, § 3(b)(3), Fla. Const. And the Court has noted "that we take seriously our obligation to provide certainty to candidates and voters regarding the legality of the state's congressional districts." *League of Women Voters of Fla. v.*

---

[4] I do not contend that *Detzner* is binding on this court since the appropriateness of certification differs in each case and the rule says that a "district court of appeal **may** make such certification." Fla. R. App. P. 9.125(a) (emphasis added). Nonetheless, using the test from *Harris*, we should have followed the example of *Detzner* and certified the judgment.

[5] As for any argument that we properly declined to pass through the appeal since the parties already appeared before us in *Byrd*, that case involved only the procedural question of whether it was appropriate for the trial court's temporary injunction to change the status quo before trial. 339 So. 3d at 1075. In *Byrd*, we did not "reach whether recently enacted Senate Bill 2-C comports with Article III, section 20, of the Florida Constitution." *Byrd*, 339 So. 3d at 1073. Weightier, substantive matters must be addressed in this appeal.

56

*Detzner* (*Apportionment VII*), 172 So. 3d 363, 372 (Fla. 2015). Our action in keeping this appeal undermines that assurance of certainty from the Florida Supreme Court.

Only the Florida Supreme Court can determine whether our action here functions as a speedbump or a stop sign on the road to determining whether a map found to violate the Florida Constitution will apply to the 2024 congressional election. Even if the enacted map is ultimately found to be constitutional, our action in not passing the appeal through for immediate resolution by the Florida Supreme Court creates "uncertainty for the voters of this state, the elected representatives, and the candidates who are required to qualify for their seats" in contravention of Florida Supreme Court policy about the constitutionality of apportionment. *See In re Senate Joint Resol. of Legis. Apportionment 1176 (Apportionment I)*, 83 So. 3d 597, 609 (Fla. 2012).

To conclude on this issue, we should have accepted the parties' joint suggestion and certified the appeal to the Florida Supreme Court almost three months ago. By failing to do so, we have deviated from our past practice and delayed the ultimate resolution to the detriment of the voters, election officials, and candidates in North Florida.

### **We Should Affirm on the Merits**

#### The Enacted Districts

For the 2016, 2018, and 2020 elections, after litigation discussed below, the Florida Supreme Court approved the following as congressional District 5 (shown in purple):



("benchmark District 5");[6] s*ee League of Women Voters of Fla. v. Detzner* (*Apportionment VIII*), 179 So. 3d 258, 271–73 (Fla. 2015).

After the 2020 Census, the Florida Legislature was required to reapportion Florida's United States House of Representatives districts. § 11.031(1), Fla. Stat. (2023). In furtherance of its duty, during the last regular session the Legislature passed CS/SB 102, which would have amended section 8.0002, Florida Statutes. The bill would have enacted the following as section 8.0002(5) to redistrict District 5 (shown in purple):



("Duval-only District 5").

CS/SB 102 also would have amended the severability provision in section 8.0611, Florida Statutes, to create an alternative "if a court determines that the district described in s. 8.002(5) is invalid under any provision of federal law, including the United States Constitution, or the Florida Constitution." This alternative would have enacted the following as section 8.0003(5) to redistrict District 5 (shown in purple):

---

[6] The reason this district is the benchmark is explained below.



("alternative District 5").

The Governor vetoed CS/SB 102, which would have created a Duval-only District 5 and the alternative District 5.[7] In a Special Session, the Legislature then passed SB 2C, which amended section 8.0002, Florida Statutes. The Governor signed this bill creating the following as the enacted District 4 (shown in yellow) and District 5 (shown in purple):[8]

---

[7] Before the enacted districts were created, the Governor sought an advisory opinion from the Florida Supreme Court. *See* Art. IV, § 1(c), Fla. Const. The Governor asked whether the Florida Constitution's non-diminishment standard required an East-West district to connect Duval County with Leon and Gadsden Counties. In this request, the Governor forthrightly cited *Apportionment VIII*, 179 So. 3d at 271, in noting that the Florida Supreme Court "has previously suggested that the answer is 'yes.'" The Florida Supreme Court respectfully denied the request for an advisory opinion. *Advisory Op. to the Governor*, 333 So. 3d at 1108.

[8] In their pretrial stipulation, the parties agreed that enacted congressional District 4 "is the district with the highest percentage of population that comes from Benchmark CD-5."

59



§ 8.002(4), Fla. Stat. ("the enacted districts or the enacted map").

Appellees challenged the elimination of benchmark District 5 in the enacted map, claiming in the amended complaint unconstitutional diminishment of "Black voters' ability to elect their candidates of choice."

<u>Fair Districts Amendments</u>

In 2010, the people of Florida adopted two amendments to the Florida Constitution known as the Fair Districts Amendments. *See* Art. III, §§ 20–21, Fla. Const.; *Apportionment I*, 83 So. 3d at 598. Until the adoption of the Fair Districts Amendments, "Florida's constitutional requirements guiding the Legislature during the apportionment process were 'not more stringent than the requirements under the United States Constitution.'" *Id.* (quoting *In re Constitutionality of House Joint Resol. 1987*, 817 So. 2d 819, 824 (Fla. 2002)).

The amendments "adopted identical standards" for congressional redistricting in section 20 and legislative redistricting under section 21. *Apportionment I*, 83 So. 3d at 598 n.1.[9] Section 20, which is at issue here, stated:

---

[9] The majority opinion makes the novel argument that *Apportionment I* and *In re Senate Joint Resolution of Legislative Apportionment 2-B* (*Apportionment II*), 89 So. 3d 872, 889–90 (Fla. 2012), are not binding on this court. This argument was not made by the Appellants. In fact, Appellants repeatedly cited

In establishing congressional district boundaries:

(a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and **districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice**; and districts shall consist of contiguous territory.

(b) Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c) The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

---

*Apportionment I* in their initial briefs. The Legislative parties stated in part, "the Florida Supreme Court recognized that new districts may not 'weaken' historically performing districts, 83 So. 3d at 625, and that the non-retrogression standard adopted by Congress, and more recently by Florida, asks whether the minority population is 'more, less, or just as able to elect a preferred candidate of choice after a change as before.'" The Secretary's initial brief also recognized the precedential importance of *Apportionment I*, stating that it "dealt with an identically worded constitutional provision for state legislative districting, *see* Art. III, § 21, Fla. Const., but the case's analysis applies equally to Section 20, *see League of Women Voters of Fla. v. Fla. House of Representatives*, 132 So. 3d 135, 139 n.2 (Fla. 2013)." The Florida Supreme Court in both *Apportionment VII* and *Apportionment VIII*, involving the review of trial court decisions, cited *Apportionment I* with approval.

(emphasis added).  The standards in section 20(a) are known as tier-one standards, while the standards in section 20(b) are known as tier-two standards.  *Apportionment I*, 83 So. 3d at 615.

The portion of section 20(a) at issue "imposes two requirements that plainly serve to protect racial and language minority voters in Florida:  prevention of impermissible vote dilution and prevention of impermissible diminishment of a minority group's ability to elect a candidate of its choice." *Apportionment I*, 83 So. 3d at 619.  "[B]oth clauses impose a restrictive imperative, *each of which must be satisfied.*"  *Id.* (quoting *Advisory Op. to Att'y Gen. re Standards For Establishing Legis. Dist. Boundaries*, 2 So. 3d 175, 189 (Fla. 2009) (plurality opinion)).

The "equal opportunity" clause in section 20(a) is protection against dilution.  *Apportionment I*, 83 So. 3d at 619.  This clause "is essentially a restatement of Section 2 of the Voting Rights Act (VRA), which prohibits redistricting plans that afford minorities 'less opportunity than other members of the electorate to participate in the political process.'"  *Apportionment I*, 83 So. 3d at 619 (quoting 42 U.S.C. § 1973(b) (2006)).  "A successful vote dilution claim under Section 2 requires a showing that a minority group was denied a majority-minority district that, but for the purported dilution, **could have potentially existed**." *Apportionment I*, 83 So. 3d at 622 (emphasis added).  A dilution claim was not alleged at trial and is not before us.

The only requirement of section 20(a) asserted at trial below and now before us is the non-diminishment clause.  This "reflects the statement codified in Section 5 of the VRA."  *Apportionment I*, 83 So. 3d at 620.  "Florida's constitutional provision now embraces the principles enumerated in Sections 2 and 5 of the VRA.  Because Sections 2 and 5 raise federal issues, our interpretation of Florida's corresponding provision is guided by prevailing United States Supreme Court precedent." *Apportionment I*, 83 So. 3d at 620.  "Section 5 attempts to eradicate impermissible retrogression in a minority group's

ability to elect a candidate of choice."[10] *Apportionment I*, 83 So. 3d at 620. "[T]he Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Id.* at 625.

The Florida Supreme Court has described as follows the analysis governing the determination of whether diminishment occurred:

> [T]he extent to which benchmark and new districts perform for minority voters—that is, enable those voters to elect the candidate of their choice—requires a "functional analysis" of voting behavior within the districts at issue. Such analysis considers statistical data pertaining to voting age population; voter-registration data; voting registration of actual voters; and election results history.

*In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1289 (Fla. 2022) (citing *Apportionment I*, 83 So. 3d at 625, 627).

A district does not have to be majority-minority to be protected from diminishment, but districts where Black voters or other racial minorities make up the majority of the population are protected. *See Apportionment I*, 83 So. 3d 625 (citing *Texas v. United States*, 831 F. Supp. 2d 244, 265–68 (D.D.C. 2011)). The Florida Supreme Court stated that, "in addition to majority-minority districts, coalition or crossover districts that previously provided minority groups with the ability to elect a preferred candidate under the benchmark plan must also be recognized." *Id.*

---

[10] Retrogression and diminishment are synonymous in the context of both Section 5 of the VRA and the Fair Districts Amendments. *See Apportionment I*, 83 So. 3d at 619–20.

The Parties' Stipulation and Trial Court Proceedings

The parties narrowed the issues for trial and reached a pretrial stipulation. They agreed that in the 2016, 2018, and 2020 general elections, "Black voters were politically cohesive in elections in the district." They agreed that during those three elections "voting was racially polarized in the district" and that the "candidate of choice for Black voters in the district" won each of the three elections. They also agreed that under the enacted map the Black voting age population of the district decreased from 46.2% to 31.7%. Finally, they agreed, "None of the Enacted districts in North Florida are districts in which Black voters have the ability to elect their preferred candidates."[11]

---

[11] I respectfully disagree with the majority's contention that the ability of Black voters to "elect the candidate of their choice" is a question of law not controlled by the stipulation of the parties. The law may supply the meaning of the term, but whether a new district diminishes the ability of Black voters to elect a candidate of their choice is based on facts. *See Thornburg v. Gingles*, 478 U.S. 30, 41 (1986) ("Based on statistical evidence presented by expert witnesses, supplemented to some degree by the testimony of lay witnesses, the [federal district] court found that all of the challenged districts exhibit severe and persistent racially polarized voting."); *McMillan v. Escambia Cnty., Fla.*, 748 F.2d 1037, 1043 (5th Cir. 1984) ("Defendants contend that voting in Escambia County is not polarized. This contention is not supported by the evidence."); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1279–80 (S.D. Fla. 2002) ("We present detailed findings of fact comparing voting behavior by race in performing black districts existing before and after the redistricting process at issue in this litigation."). The stipulation of the parties established the facts here and is binding on us. *See Troup v. Bird*, 53 So. 2d 717, 721 (Fla. 1951). Additionally, the Appellants did not make the argument that the stipulation was insufficient to establish diminishment, so it is not preserved. *Citizen of State v. Clark*, 48 Fla. L. Weekly S217, S217, 2023 WL 7400723, *2 (Fla. Nov. 9, 2023) (citations omitted) ("The preservation requirement also serves the purpose of treating the parties, the court, and the judicial system fairly."). Nor was the issue even raised in the Appellants' briefs, so it is not a basis to reverse.

In the stipulation, the parties disagreed on whether the diminishment standards in Fair Districts could be applied to the enacted districts. The Appellants claimed as Question 1 for the trial court's determination that the Appellees had to satisfy the precondition requirement under *Thornburg v. Gingles*, 478 U.S. 30 (1986), before Appellees could state a diminishment claim. But the parties agreed that if *Gingles* did not apply, diminishment had been proved.[12] The stipulation stated,

> Defendants [Appellants] concede that if the non-diminishment standard applies to North Florida (Question #1), then there is no Black-performing district in North Florida under the Enacted Map. The parties agree that the former congressional district 5 used for the 2016, 2018, and 2020 congressional elections was a Black-performing district.

The trial court found that the benchmark district was the District 5 the Florida Supreme Court approved in 2015; that all the *Gingles* preconditions did not apply to a diminishment claim; that diminishment had occurred in violation of the Florida Constitution; and that Appellants' Equal Protection arguments were unavailing.

Florida Supreme Court Approved the Benchmark District in 2015

The parties disagree about which benchmark district to use in evaluating the diminishment claim. After redistricting occurred following the 2010 census much litigation ensued. *See,*

---

*Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc) (citing *D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 888 (Fla. 2018) (Canady, C.J., dissenting)) ("[I]t is not the role of the appellate court to act as standby counsel for the parties.").

[12] Appellants also claimed as Questions 2 and 3 that applying Fair Districts to North Florida congressional redistricting violates Equal Protection and that the non-diminishment provision in Fair Districts was facially unconstitutional. The Equal Protection issue is addressed below.

*e.g.*, *Apportionment I*; *Apportionment VII*; *Apportionment VIII*. Congressional District 5 as well as other congressional and legislative districts were found to violate the Fair Districts Amendments. *Apportionment VII*, 172 So. 3d at 402–06. The Florida Supreme Court held that District 5 unconstitutionally favored a political party and had to be redrawn. *Id.*

There is no requirement in Florida or federal law that a district must have been created as a remedy for a dilution or diminishment for the district to be used as a benchmark district in a later claim of diminishment. Rather, "[r]etrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 478 (1997) (citing *Holder v. Hall*, 512 U.S. 874, 883 (1994)). "The permissible use of racial criteria is not confined to eliminating the effects of past discriminatory districting or apportionment." *United Jewish Org. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 161 (1977).

"A plan leads to impermissible retrogression when, compared to the plan currently in effect (typically called a 'benchmark plan'), the new plan diminishes the number of districts in which minority groups can 'elect their preferred candidates of choice' . . . ." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 260 (2016). For diminishment claims "[t]he baseline for comparison is present by definition; it is the existing status. While there may be difficulty in determining whether a proposed change would cause retrogression, there is little difficulty in discerning the two voting practices to compare to determine whether retrogression would occur." *Holder*, 512 U.S. at 883–84 (citing 28 CFR § 51.54(c) (1993)); *see also Abrams v. Johnson*, 521 U.S. 74, 97 (1997) ("There are sound reasons for requiring benchmarks to be plans that have been in effect; otherwise a myriad of benchmarks would be proposed in every case, with attendant confusion.").

Race was an issue that led to the creation of benchmark District 5. The previous district had favored a political party by packing Black voters into one district, reducing their "influence . . . in surrounding districts." *Apportionment VII*, 172 So. at 402. The Florida Supreme Court was conscious of diminishment in

deciding how the new District 5 should be drawn to comply with the Fair Districts requirements in the Florida Constitution. *Id*. at 403–06. "Since the Legislature cannot prove that the North-South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice, we hold that District 5 must be redrawn in an East-West manner." *Id*. at 403. The Court further stated, "Accordingly, we reject the Legislature's argument that an East-West version of the district would diminish the ability of black voters to elect a candidate of their choice." *Id*. at 405. The Court then concluded "District 5 must be redrawn in an East-West orientation." *Id*. at 406.

After further proceedings, the Legislature approved a redrawn District 5 as complying with the Florida Constitution as the Florida Supreme Court had directed. *Apportionment VIII*, 179 So. 3d at 271–73. Again, the Florida Supreme Court considered the non-diminishment requirement in the Fair Districts Amendment. *Id*. at 273. The Court concluded, "Because the proposed district comports with this Court's directions in *Apportionment VII* and does not diminish the ability of black voters to elect a candidate of choice, the Legislature has met its burden to justify the configuration it selected." *Apportionment VIII*, 179 So. 3d at 273. The Court therefore approved benchmark District 5. *Id*. at 271.[13]

---

[13] The Court discussed the shape of the district in *Apportionment VII* in stating, "There is no doubt that an East-West version of District 5 is visually less 'unusual' and 'bizarre' than the meandering North-South version enacted by the Legislature." 179 So. 3d at 406 (citing *Apportionment I*, 83 So. 3d at 634). Various current districts throughout the State have features much like the benchmark District 5 approved in *Apportionment VIII*. *See* Redistricting.Maps.Arcgis.com, https://redistricting.maps.arcgis.com/apps/View/index.html?appid =2c92665fc1d14fc2becb3030e23a4595 (last visited Nov. 17, 2023). The only difference is that the benchmark District 5 spanned multiple counties, just like other north Florida districts, because of the lower population in some of these counties when compared to the rest of Florida. In discussing the shape of a district when faced with a diminishment claim the Court stated, "We recognize that in certain situations, compactness and other redistricting

Applying these cases, the benchmark plan — that is the baseline for comparison in evaluating Appellees' diminishment claim — is the benchmark District 5 that the Florida Supreme Court mandated in *Apportionment VII* and approved in *Apportionment VIII*. Nonetheless, Appellants argue that benchmark District 5 is an unconstitutional racial gerrymander and cannot be used as a benchmark district. But a trial court or district court cannot overrule the Florida Supreme Court. *See Hoffman v. Jones*, 280 So. 2d 431, 433–34 (Fla. 1973) ("To allow a District Court of Appeal to overrule controlling precedent of this Court would be to create chaos and uncertainty in the judicial forum. . . .").

And even if we could revisit what the Florida Supreme Court decided in *Apportionment VIII*, that decision is res judicata between the parties.[14] *See In re Senate Joint Resol. of Legis. Apportionment 2-B* (*Apportionment II*), 89 So. 3d 872, 883–85 (Fla. 2012). "Based on principles of res judicata, a judgment on the merits will thus bar 'a subsequent action between the same parties on the same cause of action.'" *Florida Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001) (quoting *Youngblood v. Taylor*, 89 So. 2d 503, 505 (Fla. 1956)).

The League of Women Voters of Florida was a party in *Apportionment VII* and *Apportionment VIII* and is a party among the Appellees here. The Florida House, Florida Senate, and the Florida Secretary of State were parties in *Apportionment VII* and *Apportionment VIII* and are the Appellants here. "Importantly, the doctrine of res judicata not only bars issues that were raised,

---

criteria, such as those codified in tier two . . . will be compromised in order to avoid retrogression." *Apportionment I*, 83 So. 3d at 626.

[14] I do not contend that Appellants could not challenge a subsequent map drawn after court-ordered redistricting. Instead, my contention is that the principle of res judicata requires that the district the Florida Supreme Court approved in *Apportionment VIII* is locked in as the benchmark district for this case involving the same parties.

but it also precludes consideration of issues that could have been raised but were not raised in the first case."[15] *Juliano*, 801 So. 2d at 105 (citing *Youngblood*, 89 So. 2d at 505); *see also Apportionment II*, 89 So. 3d at 884. Appellants could have claimed racial gerrymandering in opposing District 5 in *Apportionment VII* and *Apportionment VIII*, but they did not. *Apportionment VIII* sets the benchmark District 5 to be used in considering the diminishment claim.

The Majority Opinion Incorrectly Applies<br>*Gingles* to a Diminishment Claim

The majority opinion holds that despite the undisputed evidence of diminishment in the enacted districts, Appellees have not met their burden of proof because the preconditions from *Gingles* were not met. The holding in *Gingles* has "three threshold conditions for proving vote dilution under § 2 of the VRA." *Cooper v. Harris*, 581 U.S. 285, 301 (2017) (citing *Gingles*, 478 U.S. at 50–51).[16] The key *Gingles* precondition, which was not met here, is that "a 'minority group' must be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Cooper*, 581 U.S. at 301 (quoting *Gingles*, 478 U.S. at 50).

But *Gingles* involved Section 2 of the VRA, and its holding does not apply to diminishment claims. The United States Supreme Court recognized this important distinction in stating, "We have, however, 'consistently understood' § 2 to 'combat

---

[15] Although not required for res judicata to apply, in *Apportionment VII* the Appellants here, who were the appellees in that case, raised the issue that "article III, section 20, of the Florida Constitution is invalid because it violates the United States Constitution." *Apportionment VII*, 172 So. 3d at 372 n.4.

[16] If the preconditions are met in a Section 2 dilution claim, then the plaintiff "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Allen v. Milligan*. 599 U.S. 1, 19 (2023) (quoting *Gingles*, 478 U.S. at 45–46).

different evils and, accordingly, to impose very different duties upon the States.'" *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003) (quoting *Bossier Parish Sch. Bd.*, 520 U.S. at 471, 477). The Court in *Ashcroft* recognized that *Gingles* did not apply to a diminishment claim:

> And the § 2 inquiry differs in significant respects from a § 5 inquiry. In contrast to § 5's retrogression standard, the "essence" of a § 2 vote dilution claim is that "a certain electoral law, practice, or structure ... cause[s] an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); see also *id.,* at 48–50, 106 S.Ct. 2752 (enunciating a three-part test to establish vote dilution); *id.,* at 85–100, 106 S.Ct. 2752 (O'CONNOR, J., concurring in judgment); 42 U.S.C. § 1973(b). Unlike an inquiry under § 2, a retrogression inquiry under § 5, "by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." *Bossier Parish I, supra,* at 478, 117 S.Ct. 1491. While some parts of the § 2 analysis may overlap with the § 5 inquiry, the two sections "differ in structure, purpose, and application." *Holder v. Hall,* 512 U.S. 874, 883, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (plurality opinion).

*Ashcroft*, 539 U.S. at 478.

Here, we are addressing a benchmark district that already existed until it, or anything resembling it, was written out of existence in 2022. In the redistricting context, diminishment claims are based on a real district that had existed, while dilution claims are based on a potential district that could exist. *Compare Bossier Parish Sch. Bd.*, 520 U.S. at 478 (citing *Holder*, 512 U.S. at 883) ("Retrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan."), *with Apportionment I*, 83 So. 3d at 622 ("A successful vote dilution claim under Section 2 requires a showing that a minority group was denied a majority-minority district that, but for the purported dilution, **could have potentially existed**.") (emphasis added).

A diminishment claim is not based on the number of minority voters in an enacted district. "Section 5 . . . does not require a covered jurisdiction to maintain a particular numerical minority percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice. That is precisely what the language of the statute says." *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 275 (2015). The Fair District Amendment has the same language protecting from diminishment "racial or language minorities['] . . . ability to elect representatives of their choice." Art. III, § 20(a), Fla. Const.

The best that the majority opinion can argue for the application of *Gingles* to diminishment claims is to point to a footnote from *Apportionment VIII* that states, "The *Gingles* preconditions are relevant not only to a Section 2 vote dilution analysis, but also to a Section 5 diminishment analysis." *Apportionment VIII*, 179 So. 3d at 286 n.11 (citing *Texas*, 831 F. Supp. 2d at 262–63). But the Florida Supreme Court did not import all of the *Gingles* preconditions into a diminishment claim. That footnote pertains to "voting cohesion and polarized racial bloc voting—the establishment of which is the first step in any retrogression analysis." *Apportionment VIII*, 179 So. 3d at 286.

The Court in *Apportionment VIII* discussed *Gingles* and did not require that the minority population constitute a majority of the voting age population in the district. *Apportionment VIII*, 179 So. 3d at 286 n.11. The footnote in *Apportionment VIII* discussing the *Gingles* preconditions was reminding the parties that the "test for retrogression" includes "whether the minority group votes cohesively." *Id*. This is the same as the second *Gingles* precondition, which requires that the "minority group must be 'politically cohesive.'" *Cooper*, 581 U.S. 301–02 (quoting *Gingles*, 478 U.S. at 51). Cohesion among Black voters and racial polarization in benchmark District 5 was part of the parties' stipulation, was thereby established, was not argued to the contrary by Appellants, and is uncontested here.[17]

---

[17] Therefore, as discussed in footnote 11, any claim that the Black voters in benchmark District 5 were not cohesive or polarized in voting, or that there was insufficient proof of Black

71

Never before in Florida or United States Supreme Court precedent has a proposed majority-minority district been required before a diminishment claim could be considered. Just last year, the Florida Supreme Court noted that *Gingles* applies to dilution claims and requires a majority-minority district. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1288 n.5. But the test for diminishment claims was different and did not include this requirement from *Gingles*. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1289 (citing *Apportionment I*, 83 So. 3d at 625). Rather, diminishment claims could apply when a redistricting serves to either "eliminate majority-minority districts **or weaken other historically performing minority districts**." *Id.* (quoting *Apportionment I*, 83 So. 3d at 625) (emphasis added). The consideration for diminishment claims therefore differs from this *Gingles* precondition. *See In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1289 (citing *Apportionment I*, 83 So. 3d at 625).

By applying the *Gingles* majority-minority precondition from a dilution claim to a diminishment claim, the majority opinion has imposed a requirement found nowhere in the Florida Constitution, in Florida Supreme Court cases, or United States Supreme Court cases. The majority opinion effectively deletes the diminishment protections in article III, section 20(a) of the Florida Constitution, since diminishment can now only be proven if dilution is present.[18]

The Enacted Districts Diminish Minority Participation

The Legislature's enacted map is initially presumed valid. *Apportionment I*, 83 So. 3d at 606, 608. The burden was on

---

voters being able to elect a candidate of their choice, was unpreserved below and is waived here.

[18] Since article III, section 21(a) on Florida legislative redistricting has the same language, the majority opinion has effectively deleted those protections too, unless a challenger can put forth a dilution claim.

Appellees as challengers of the redistricting plan to show a violation of Fair Districts. The Court in *Apportionment VII* discussed the heightened judicial scrutiny to be applied in considering "the Legislature's decisions in redistricting." 172 So. 3d at 398 (citing *Fla. House of Representatives v. League of Women Voters of Fla.*, 118 So. 3d 198, 205 (Fla. 2013)). But even without heightened scrutiny, it is clear that the Appellees have shown that the enacted districts violate the non-diminishment provision in Fair Districts.

The trial court's findings of diminishment, which were consistent with the parties' stipulation, are therefore supported by competent, substantial evidence. *See Apportionment VIII*, 179 So. 3d at 271 (reviewing a trial court's factual findings for competent, substantial evidence). A historically performing benchmark district for Black voters was not just diminished — it was eliminated. This is not like *Abrams*, cited in the majority opinion, where a 10% minority district was reduced to 9%. 521 U.S. at 97. The change here was not de minimis. A politically cohesive racial minority is now denied the ability to elect a candidate of choice in a racially polarized district, showing that unconstitutional diminishment has occurred. The people of Florida have given us the Fair Districts Amendments, and it is our "duty" to enforce it. *Apportionment I*, 83 So. 3d at 607.

<u>The Appellants Did Not Carry Their Burden<br>to Prove Their Equal Protection Defense</u>

The final issue for our consideration is the Appellants' Equal Protection defense.[19] As shown above, Appellees proved a diminishment claim in the benchmark district. Appellants contend that Appellees still had the burden to show a remedial map could be drawn without violating the United States

---

[19] The majority opinion does not decide this issue, but two concurring opinions would reverse based on either the Equal Protection Clause of the United States Constitution or the "equal before the law" provision in article I, section 2 of the Florida Constitution.

Constitution's Equal Protection Clause.[20]  U.S. Const. amend. XIV, §1.  This is incorrect since Appellants raised the Equal Protection issue as an affirmative defense.[21]  The burden of proof was therefore on Appellants to prove that no district could be drawn that both complied with Fair Districts and did not violate Equal Protection.  *See Custer Med. Cntr. v. United Auto Ins. Co.*, 62 So. 3d 1086, 1096 (Fla. 2010) ("The defendant has the burden of proving an affirmative defense."); *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995) (putting the burden on the party claiming an unconstitutional racial gerrymander to show "that race was the predominant factor motivating the legislature's decision").  Appellants did not carry their burden.

Importantly, the trial court did not order the Legislature to draw a specific district map and did not impose a map of its own creation.  All the trial court did was enjoin the use of the enacted district map and returned redistricting to the Legislature "to enact a remedial map in compliance with Article III, Section 20 of the Florida Constitution."  "[T]he basic unit of analysis for racial

---

[20] The Legislative parties cite *Apportionment II*, 89 So. 3d at 889–90, for this proposition.  But the subject district in *Apportionment II* was being challenged as violating the compactness tier-two standard.  *See* Art. III, §21(b), Fla. Const.  The Court in *Apportionment II* held the alternative plans the challengers provided did not meet their burden of proof because the alternative plans would have "raise[d] concerns" about non-diminishment.  89 So. 3d at 889; *see also* Art. III, § 21(b), Fla. Const. (establishing compactness as a tier-two standard to be followed "[u]nless compliance with the" tier-two standards "conflicts with the standards in subsection (a) or with federal law").  Likewise, Appellants' reliance on *Apportionment I* was misplaced because that also involved tier-two standards that had to yield to tier-one standards.  83 So. 3d at 653.

[21] I agree with the Appellants that the public official standing doctrine does not apply in this case, so they could raise affirmative defenses.  Still, the trial court analyzed the Appellants' arguments on the merits, so the erroneous application of the doctrine does not provide a basis to reverse.

gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 191 (2017); *see also Alabama Legis. Black Caucus*, 575 U.S. at 262–63. Since the trial court's order is stayed pending all appellate review, the Legislature has yet to draw a new, compliant district. Without a district for the courts to evaluate, there can be no finding of racial discrimination.

Race can be considered in redistricting so long as race does not predominate. *Allen v. Milligan*. 599 U.S. 1, 30 (2023); *Miller*, 515 U.S. at 915–16; *see also Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1283 (11th Cir. 2012) ("[I]t must surely be appropriate for a state legislature to take into account the effect that its new districts will have on racial and language minorities.").[22] The Governor correctly recognized this when, in seeking an advisory opinion on how to draw the district, he stated, "I ask for your opinion to help me be sufficiently conscious of race to comply with the Florida Constitution's anti-diminishment provision but avoid being so conscious of race that my actions could violate the U.S. and Florida Constitutions."

If race could not be considered at all, there never could be a dilution or a diminishment claim. *See Robinson v. Ardoin*, 22-30333, 2023 WL 7711063, at *10 (5th Cir. Nov. 10, 2023) ("Refusing to allow redistricting maps based on race in *any* respect, though, would require *Gingles* to be overruled."). However, the United States Supreme Court in *Allen* recently allowed race conscious redistricting arising out of a dilution claim. 599 U.S. at 30–31.

---

[22] "A longstanding general history of official discrimination against minorities has influenced Florida's electoral process." *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992). The Fair Districts Amendments "are not designed to compel electoral outcomes but rather, by their very terms, merely to level the playing field by ensuring equality among *all* voters and by increasing opportunities for *all* candidates." *Brown*, 668 F.3d at 1281.

Unconstitutional racial gerrymandering can occur if race predominates the considerations in redistricting. *Id.* But Fair Districts provides two other tier-one factors that are as important as the protections against dilution or diminishment — the district cannot be "drawn with the intent to favor or disfavor a political party or incumbent. . . and districts shall consist of contiguous territory." Art. III, § 20(a), Fla. Const. These tier-one factors are entitled to equal consideration. Art. III, § 20(c), Fla. Const. And the tier-two factors that "districts shall be nearly equal in population as practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries" are to be applied if possible, also showing that race does not have to be predominant in complying with Fair Districts. Art. III, § 20(b), Fla. Const. "Instead, an express racial target is just one consideration in a traditional redistricting analysis" when considering a claim of unconstitutional racial gerrymandering. *Robinson*, 22-30333, 2023 WL 7711063, at *10 (citing *Allen*, 599 U.S. at 32).

To the extent that Appellants could argue, despite the application of res judicata to the issue, that the benchmark District 5 that the Florida Supreme Court approved in *Apportionment VIII* was itself an unconstitutional racial gerrymander, it should be remembered that District 5 was created to *remedy a political gerrymander*. *Apportionment VII*, 172 So. 3d at 402–06. Race and non-diminishment of Black voters were permissible considerations in redistricting leading to the establishment of benchmark District 5, but race did not predominate over the other Fair Districts requirements thoroughly considered by the Court. *Id.*

Finally, even if the burden were shifted and Appellees had to show a map that could be created without violating equal protection, Appellees did so with both the Duval-only District 5 and the alternative District 5 that the Legislature approved but was then vetoed. The trial court found that Duval-only District 5 "is extremely compact," and "it complies with basic traditional redistricting criteria such as equal population, contiguity, or adherence to political and geographic boundaries." The trial court's order also carefully analyzed the alternative District 5

76

and found that the alternative district "performs reasonably well on objective, non-racial traditional redistricting criteria."[23]

Two concurring opinions would have the courts ignore race in considering diminishment of racial minority voting strength stemming from redistricting. The dissent in *Allen* raised these same concerns in considering dilution claims. 599 U.S. at 45–46. But we cannot overrule *Allen* and the many other cases that allowed race to be considered in redistricting so long as race did not predominate. *See Miller*, 515 U.S. at 916; *Bush v. Vera*, 517 U.S. 952, 958 (1996) (plurality opinion) ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race."); *Shaw v. Reno*, 509 U.S. 630, 646 (1993) ("[R]ace consciousness does not lead inevitably to impermissible race discrimination."). Ignoring race would go against what the people of Florida have required of us in approving the Fair Districts Amendments. Since no racially discriminatory district has been drawn and since there are districts that do not violate Equal Protection that could replace the enacted, unconstitutional districts, Appellants' Equal Protection defense must fail.

## Conclusion

For the above reasons, I would have certified this appeal for immediate resolution by the Florida Supreme Court. Barring that, I would affirm because Appellees have proven unconstitutional diminishment in the benchmark district, and Appellants' Equal Protection Clause defenses are unavailing. Because the en banc majority incorrectly reverses the well-reasoned decision of the trial court, I respectfully dissent.

---

[23] The Duval-only District 5 might result in greater diminishment than the alternative District 5. But if Equal Protection is a "tier-zero" consideration, as Appellants argue, that prevents the drawing of an East-West district, then the Duval-only District 5 at least complies somewhat with the non-diminishment protection in Fair Districts while avoiding any possible claim of an Equal Protection violation.

_____

Mohammad O. Jazil, Michael Beato, Ed Wenger, and Gary V. Perko of Holtzman Vogel Baran Torchinsky & Josefiak, PLLC, Tallahassee; and Bradley R. McVay, Joseph S. Van de Bogart, and Ashley E. Davis, Florida Department of State, Tallahassee, for Appellant Secretary of State Byrd.

Andy Bardos of GrayRobinson, P.A., Tallahassee, for Florida House Appellants.

Daniel E. Nordby, George N. Meros, Jr., and Tara R. Price of Shutts & Bowen LLP, Tallahassee; and Carlos Rey and Kyle Gray, Florida Senate, Tallahassee, for Florida Senate Appellants.

Henry C. Whitaker, Solicitor General, Tallahassee; Jeffrey Paul DeSousa and Daniel W. Bell, Chief Deputy Solicitors General, Tallahassee; David M. Costello, Deputy Solicitor General, Tallahassee; and Bilal Ahmed Faruqui, Assistant Attorney General, Tallahassee, for Attorney General Ashley Moody.

Frederick S. Wermuth, Quinn B. Ritter, and Thomas A. Zehnder of King, Blackwell, Zehnder & Wermuth, P.A., Orlando; and Christina A. Ford and Jyoti Jasrasaria of Elias Law Group LLP, Washington, D.C., for Appellees.